No. 82-391

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

STATE OF MONTANA,

             Plaintiff and Respondent,

     -vs-

STEPHEN E. FARRELL,

             Defendant and Appellant.

APPEAL FROM: District Court of the First Judicial District,
             In and for the County of Lewis & Clark,
             The Honorable Gordon R. Bennett, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

             Harlen, Thompson & Parish; Shaun R. Thompson argued,
             Helena, Montana

     For Respondent:

             Mike Greely, Attorney General, Helena, Montana
             James McLean argued, Asst. Atty. General, Helena
             Mike McGrath, County Attorney, Helena, Montana

                              Submitted:  September 29, 1983

                              Decided:    January 17, 1984

Filed: JAN 17 1984

_Ethel M. Harrison_

                           Clerk

Mr. Justice L.C. Gulbrandson delivered the Opinion of the Court.

Appellant Stephen Farrell was convicted of theft of public assistance funds by a jury in the District Court of the First Judicial District, Lewis and Clark County. He has appealed both the conviction and his sentence to this Court. For the reasons stated below, we affirm the conviction, but vacate the sentence and remand for resentencing.

The appellant was discharged from the United States Navy on December 17, 1979. After his discharge, appellant, his wife Margaret, and a step-daughter returned to his home town, Helena. Margaret was pregnant on the family's arrival in Helena, and because their finanical situation was precarious, the Farrells went to the Lewis and Clark County Welfare Department to apply for medical assistance and food stamps. At the time of the application they were told that they could apply for Aid to Families with Dependent Children (AFDC), which included Medicaid, as well as food stamps. A welfare worker cautioned them that they should report any change in financial circumstances. Based on their application of January 7, 1980, the Farrells were certified to receive AFDC benefits for a period of six months and food stamps for one month.

During the period from March until May 1980, the appellant received a number of unemployment checks. The Farrells claim that this income was reported to the Welfare Department. Witnesses for the State, however, testified at his trial that they had no record of any such report.

In early June, Farrell was advised that he would begin receiving veteran's benefit checks. On June 16, 1980, a

check for $260.80 was mailed to him. The records custodian at Fort Harrison stated that Farrell should have received the check within six to ten days. Despite this, on June 27, which would have been the end of the ten-day period, the appellant reapplied for food stamps. In that application, he indicated he was not receiving any veterans' benefits.

In July, Farrell began working part-time for his uncle, Eugene L. "Bud" Menth, at Capital Excavating, in Helena. He did not report the income received from this job to the Welfare Department, and he continued to receive full AFDC benefits and food stamps. AFDC checks and Authorization to Purchase Food Stamps (ATP) cards include statements to the effect that endorsing the checks or signing the cards amounts to an affirmation that the signer's financial condition has not changed, and that all information provided for purposes of establishing eligibility is true. Farrell's signature appeared on all the cards and checks issued to him.

In late August, the Farrells again applied for assistance. That application did not reflect his income from Capital Excavating, and listed only his veterans' benefits as income. However, the Welfare Department was informed that Farrell was working and requested that he provide it with a statement of his earnings. He did so by presenting two notes from employer Bud Menth setting out his wage rate and estimated hours. The amounts specified were not great enough to make the appellant ineligible for benefits. Menth's statements later turned out to be incorrect. At trial, the State, through Menth's bookkeeper, introduced a summary of Farrell's 1980 earnings which showed

he had earned substantially more than the estimates reflected, e.g., July, $350; August, $920; September $1,260; October, $1,036; November, $560.

Farrell was eventually charged with purposely or knowingly exerting unauthorized control over public assistance funds by knowingly making false statements to procure the funds, a violation of Section 45-6-301(4)(a), MCA. Farrell was also charged under Section 45-6-301(6) for procuring the funds on several separate occasions as part of a common scheme. He was tried before a jury, and was found guilty. The trial court sentenced Farrell to ten (10) years in prison, the service of that term being suspended upon "strict and complete adherence" to the following conditions: (1) that he make restitution of the welfare funds illegally obtained, or $3,864.03, and the required 25 percent penalty thereon, or $966.25; (2) that he reimburse the court for expenses incurred by his attorney up through sentencing, approximately $2000, and for any further legal expenses incurred, and to pay an additional ten percent interest on all reimbursements; and (3) that he undergo treatment for his alcohol problem.

Farrell appeals from his conviction and those portions of his sentence concerning the number of years and the terms of restitution and recoupment of attorney fees. Specifically, he presents five issues:

(1) Whether there was substantial evidence before the District Court and the jury to support the verdict, and whether the District Court erred in not granting appellant's motions to dismiss or for a directed verdict?

(2) Whether the District Court erred in giving State's

-4-

proposed instructions 9 and 12 (Court's 10 and 9) concerning the obligation of recipients of public assistance to report changes of income within ten days?

(3) Whether the District Court committed reversible error by failing to instruct on the lesser included offense of misdemeanor theft?

(4) Whether the District Court's judgment and sentence were improper in that the court failed to take into consideration the appellant's financial resources in ordering him to pay restitution, and to reimburse the County for the cost of his court-appointed attorney?

(5) Whether the District Court violated appellant's constitutional right of equal protection by apparantly basing the length of his sentence on his economic status and earning ability?

We treat Issues One and Two together, as they arise from substantially the same argument; i.e., that the appellant Farrell was somehow convicted of an offense for which he was not charged.

The information filed by the county attorney indicates that Farrell was charged with a violation of Section 45-6-301(4)(a): purposely or knowingly obtaining or exerting unauthorized control over public assistance funds, by knowingly making false statements to the Lewis and Clark County Welfare Department. Farrell was also charged with having procured the funds over a period of months as part of a "common scheme." Section 45-6-301(6), MCA. At trial, the state produced evidence of false statements made by Farrell in three different contexts: (1) by applying for public assistance; (2) by endorsing five AFDC checks; and (3) by

-5-

applying for food stamps. In addition, the State put forth evidence to show that Farrell had failed to notify welfare authorities of changes in his financial condition.

The gravamen of Farrell's argument is that the State failed to produce substantial evidence of his ever making false statements to the welfare authorities. Moreover, he argues that the alleged failures to report changes in financial condition do not constitute the making of false statements. Because he was charged only with making false statements to obtain the funds, Farrell reasons that the charges against him should have been dismissed. In the alternative, Farrell argues for a new trial on the basis that Jury Instructions 9 and 10, when read together, instructed the jury that Farrell could be found guilty for failing to report changes in his eligibility to receive public assistance. Because Farrell was not charged with this offense, the instructions are to be deemed improper for this particular case.

We agree with the appellant Farrell that the failure to report changes in financial condition does not constitute the making of "false statements" within the scope of Section 45-6-301(4)(a). The failure to report is in the nature of an "omission," i.e., "[t]he neglect to perform what the law requires." Black's Law Dictionary 979 (5th ed. 1979). If Farrell had been charged under subsection (b) of Section 45-6-301(4), MCA--theft of public assistance funds by a "fraudulent scheme or device,"--the omissions would have been sufficient to constitute a crime. See State v. Allison (1952), 173 Kan. 107, 244 P.2d 176. Nevertheless, the failure to charge Farrell for not reporting changes in his

-6-

financial condition does not warrant reversal of his conviction. We find substantial credible evidence of false statements made by Farrell to obtain welfare assistance. For example, Farrell endorsed several AFDC checks, and in so doing, affirmed that his eligibility status had not changed and that prior information submitted to determine this status was true. These are "statements," as are the affirmations on the original application forms and ATP cards, and evidence produced by the State at trial tended to prove that these statements were false. Farrell was undoubtedly receiving enough outside income so as to render him ineligible for the sums he received. It is of no consequence to this appeal that many of the "statements" were in effect made to state agencies, and not the county welfare department, which was the only entity mentioned in the information. That there was evidence of false statements made to obtain the welfare assistance was legally sufficient to convict him of theft under Section 45-6-301(4)(a).

Thus, the trial court did not err by failing to grant appellant's motions to dismiss or for a directed verdict. Similarly, the rendering of Instructions No. 9 and 10 was not prejudicial to defendant's case. The jury was properly instructed on the elements of theft outlined in Section 45-6-301(4)(a) and on the concept of common scheme, and therefore had an acceptable legal basis upon which to consider the available evidence. Where jury instructions, taken as a whole, state the law applicable to a case, a party cannot claim reversible error as to giving of certain instructions. Goodnough v. State (Mont. 1982), 647 P.2d

364, 367, 39 St.Rep. 1170, 1173.

Appellant's third issue on appeal is whether the District Court erred by failing to instruct the jury on the lesser included offense of misdemeanor theft. In State v, Kyle (Mont. 1980), 628 P.2d 260, 263, 37 St.Rep. 1447, 1451, we held that:

> ". . . the defendant is entitled to an intruction on a lesser included offense if the evidence would enable the jury rationally to find him guilty of a lesser offense and to acquit him of the greater. Keeble v. United States (1973), 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844, 847; State v. Bouslaugh (1978), Mont., 576 P.2d 261, 263, 35 St.Rep. 319. But this Court had held that the District Court will not be put in error for refusing to instruct as to the lesser included offense, if the evidence is such to show that the defendant is either guilty of the offense charged or entitled to an acquittal. Bouslaugh, supra, Mont., 576 P.2d at 263, State v. McDonald (1915), 51 Mont. 1, 16, 149 P. 279, 285."

All the evidence, with the exception of some minor references made to small medical bills by a State witness during the State's unsuccessful attempt to introduce an exhibit on medical overpayments, shows that all the amounts received by Farrell were over $150. Looking at this record as a whole, we find that a rational trier of fact could not have found Farrell guilty of misdemeanor theft, based solely on these minor references to small medical payments. The instruction on lesser offense was properly refused.

Appellant's fourth issue goes to the Court's consideration of his financial condition when ordering restitution of amounts illegally procured from public authorities and requiring recoupment of legal fees expended in his defense and subsequent legal action on his behalf, including this appeal. He insists that the trial court did

not pay heed to provisions in statute and in case law concerning an indigent defendant's financial ability to make restitution or provide reimbursement of legal fees.

We first examine the recoupment problem. The standards for reimbursement of attorney fees are set out in Section 46-8-113, MCA:

> ". . .

> "(2) Costs must be limited to reasonable compensation and costs incurred by the court-appointed counsel in the criminal proceeding. Costs may not include expenses inherent in providing a constitutionally guaranteed jury trial or expenditures in connection with the maintenance and operation of government agencies that must be made by the public irrespective of specific violations of law.

> "(3) The court may not sentence a defendant to pay the costs of court-appointed counsel unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.

> "(4) A defendant who has been sentenced to pay costs and who is not in contumacious default in the payment thereof may at any time petition the court that sentenced him for remission of the payment of costs or of any unpaid portion thereof. If it appears to the satisfaction of the court that payment of the amount due will impose manifest hardship on the defendant or his immediate family, the court may remit all or part of the amount due in costs or modify the method of payment." (emphasis added)

Provisions similar to the above have been recognized by the United States Supreme Court as permissible under constitutional principles of equal protection and availability of legal counsel. Fuller v. Oregon (1974), 417 U.S. 40, 94 S.Ct. 2116, 40 L.Ed.2d 642. Therefore, we

reject inferences by the appellant that so-called "strong public policy reasons" should convince this Court to eliminate the practice of reimbursement for the costs of counsel.

However, we find nothing in the transcript of record or in the judgment of the trial court to indicate how or if the court took cognizance of appellant's financial resources and the burden that recoupment would impose on him. The judgment cannot stand without a meaningful inquiry into the appellant's financial status and a subsequent finding of the record that he has sufficient resources to repay costs of legal counsel. See United States v. Bracewell (2d.Cir. 1978), 569 F.2d 1194, 1197-98. In conducting an inquiry and reaching a conclusion, the trial court "need not permit a full-fledged adverarial inquiry into the nature and amount of a defendant's assets; nor need he become involved in determining priorities to these assests. [However,] . . . any defenses to payment asserted by a defendant . . . should be fully considered." Bracewell, supra, at 1200.

That portion of the judgment concerning restitution is also suspect. Restitution by itself is the recognized public policy of this state, see, e.g., Section 46-18-201(1)(a)(iv), MCA, and no arguments have been presented to the effect that requiring restitution is impermissible. Nevertheless, we have required the district courts to take into consideration a defendant's ability to make restitution, including a review of the defendant's financial resources and any burdens imposed by repayment. State v. Morgan (Mont. 1982), 646 P.2d 1177, 1183-84, 39 St.Rep. 1072, 1080-81. The mandate of Morgan was not

adhered to by the trial court in the immediate case. Under the circumstances, vacation of the sentence and a remand for new proceedings are in order. Following Morgan, the trial court must, in its written findings, "include sufficient facts to show compliance" with the conditions respecting Farrell's financial condition and his ability to make restitution. See Morgan, supra, 646 P.2d at 1184, 39 St.Rep. at 1081.

Because appellant's fifth issue for review is also connected to sentencing errors, we consider it here. This issue goes to the length of his sentence, ten years (suspended), and the grounds upon which it was allegedly based. The following excerpt from the sentencing transcript, including a colloquy between the trial judge and the appellant, apparently illustrates the only factors relevant to determination of Farrell's sentence:

> "THE COURT: Very well. You do have one plus on your record, and that is that you have served honorably in the armed forces. Other than that, I don't see any very great saving features here. The fact that you haven't been convicted before has to be balanced with the fact this is not a single offense; this was offense after offense for some seven, eight, nine months. We intend by our sentence to recover fully the amount that you owe the State; not only for the money that you secured illegally from SRS and the Welfare Department of this county, but also for the amount of money the State has laid out for your attorney.
>
> "It looks very much like before this is all out that you're probably going to pay eight to nine thousand dollars. That isn't going to be forthcoming in your life in the near future, certainly not within three years, and you would't even pretend to me that you could make that amount of money clear in three years. That's correct, isn't it?
>
> "THE DEFENDANT: I really don't know. I

-11-

wouldn't think it. It depends on the economy.

"THE COURT: Well, it depends on two things; it depends on the economy, and it depends on your sobriety.

"THE DEFENDANT: Yes, sir.

"THE COURT: Right. But the possibility of your doing that in three years is pretty small. You'd have to agree with that.

"THE DEFENDANT: I don't know, sir.

THE COURT: I don't either, and we'll take that into consideration in sentencing. You've never made that amount of money clear before, have you, in you life?

"THE DEFENDANT: No, sir, I haven't

"THE COURT: All right. It's a new experience. Because of the necessity for considerable time, I think you can succeed if you stay sober, and I think you can pay the debt, but I don't think you can do it in much less than ten years, and for that reason we're going to impose a sentence of ten years at Montana State Prison and suspend it in its entirety . . ."

From the preceding colloquy, appellant is convinced that his sentence--the maximum allowed under state law, see Section 45-6-301(5), MCA--was based only upon his indigency and was thus violative of his right to equal protection of the law. Strangely enough, the State has avoided any rebuttal to appellant's argument on this appeal. Based on our review of the transcript, we find that appellant's sentence is probably impermissable, although we rely on principles of due process, as opposed to equal protection, in reaching this conclusion.

Appellant relies on Griffin v. Illinois (1956), 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 for the general proposition that discrimination against criminal defendants

-12-

on the basis of economic status is prohibited by the equal protection clause of the fourteenth amendment. In Griffin, the United States Supreme Court held that a state could not deny appellate review of a criminal conviction merely because the defendants seeking the appeal lacked funds to purchase a transcript of lower court proceedings. The plurality opinion of Justice Black suggests that both equal protection and due process:

> "call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons. Both equal protection and due process emphasize the central aim of our entire judicial system--all people charged with crime must so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.' Chambers v. Florida, 309 U.S. 227, 241. See also Yick Wo v. Hopkins, 118 U.S. 356, 369."

351 U.S. 12, 17, 76 S.CT. 585, 589-90, 100 L.ED. 891, 898 (opinion of Black, J.). In recent years, as the courts have had an opportunity to consider Griffin in the context of sentencing, greater emphasis has been placed on equal protection in evaluating and, in some cases, invalidating certain sentencing procedures. See, e.g., Tate v. Short (1971), 401 U.S. 395, 91 S.Ct. 668, 38 L.Ed.2d 130 (violation of equal protection to limit punishment to payment of fine for those able to pay but to convert fine to imprisonment for those unable to pay); Williams v. Illinois (1970), 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (violation of equal protection to subject certain class of criminal defendants to a period of imprisonment beyond the statutory maximum solely by reason of indigency); Monsour v. Gray (E.D.Wisc. 1973), 375 F.Supp. 786 (equal protection clause proscribed absolute bar to consideration of

pre-conviction custody occasioned solely by financial inability to make bail in determining term of imprisonment to be served on conviction). See generally P. Polyviou, The Equal Protection of the Laws 522-35 (1982).

Recently, however, the United States Supreme Court apparantly has taken a cue from the late Justice Harlan, and concluded that due process, not equal protection, is the proper tool for guaging the constitutionality of sentencing procedures. This shift is most evident in the analysis in Bearden v. Georgia (1983), _____ U.S. ____, 103 S.Ct. 2064, 76 L.Ed.2d 221, a case dealing with the validity of a restitution order. The Court's analysis incorporates in large part the views first expressed by Justice Harlan in his concurring opinion in Williams v. Illinois, supra.

In Bearden, Justice O'Connor, writing for a majority, renewed the observation from Griffin that "[d]ue process and equal protection principles converge in the Court's analysis" in most cases involving indigent criminal defendants. Bearden, supra, 103 S.Ct. at 2068, 76 L.Ed.2d at 228. Despite the past emphasis on equal protection, the Court indicated that a "due process" analysis was not without support:

> "Justice Harlan in particular has insisted that a due process approach more accurately captures the competing concerns. See e.g., Griffin v. Illinois, 351 U.S. at 29-39, 76 S.Ct., at 595-600 (Harlan, J., dissenting); Williams v. Illinois, 399 U.S. 235, 259-266, 90 S.Ct. 2018, 2031-34, 26 L.Ed.2d 586 (1970)(Harlan, J., concurring). As we recognized in Ross v. Moffitt, 417 U.S., at 608-609, 94 S.Ct., at 2442-43, we generally analyze the fairness of relations between the criminal defendant and the State under the Due Process Clause, while we approach the question whether the State has invidiously denied

> one class of defendants a substantial
> benefit available to another class of
> defendants under the Equal Protection
> Clause."

103 S.Ct. at 2068-69, 76 L.Ed. 2d at 228 (emphasis added).
Arguably, the Court now recognizes that the concept of
fundamental procedural fairness, as embodied in the Due
Process Clause, has an important if not overriding role to
play in the evaluation of sentencing procedure:

> "To determine whether . . . differential
> treatment violates the Equal Protection
> Clause, one must determine whether, and
> under what circumstances, a defendant's
> indigent status may be considered in
> [, for example,] the decision whether to
> revoke probation. This is substantially
> similar to asking directly the due
> process question of whether and when it
> is fundamentally unfair or arbitrary for
> the State to revoke probation when an
> indigent is unable to pay the fine.
> Whether analyzed in terms of equal
> protection or due process, the issue
> cannot be resolved by resort to easy
> slogans or pigeonhole analysis, but
> rather requires a careful inquiry into
> such factors as 'the nature of the
> individual interest affected, the extent
> to which it is affected, the rationality
> of the connection between legislative
> means and purpose, [and] the existence of
> alternative means for effectuating the
> purpose . . . . ' Williams v. Illinois,
> supra, 399 U.S., at 260, 90 S.Ct., at
> 2031 (Harlan, J., concurring)."

103 S.Ct. at 2069, 76 L.Ed.2d at 228-29.

In a footnote, the Court indicated a preference for
the due process approach:

> "A due process approach has the advantage
> in this context of directly confronting
> the intertwined question of the role that
> a defendant's financial background can
> play in determining an appropriate
> sentence. When the court is initially
> considering what sentence to impose, a
> defendant's level of financial resources
> is a point on a spectrum rather than a
> classification. Since indigency in this
> context is a relative term rather than a
> classification, fitting 'the problem of

-15-

> his case into an equal protection
> framework is a task too Procrustean to be
> rationaly accomplished,' North Carolina
> v. Pearce, 395 U.S. 711, 723, 89 S.Ct.
> 2072, 2079, 23 L.Ed.2d 656 (1969). <u>The
> more appropriate question is whether
> consideration of a defendant's financial
> background in setting or resetting a
> sentence is so arbitrary or unfair as to
> be a denial of due process.</u>"

103 S.Ct. at 2069 n. 8, 76 L.Ed.2d at 229 n. 8. (emphasis
added). We adopt this method of analysis as most suitable
for evaluating the constitutionality of a particular
sentencing procedure. As Justice Harlan warned in his
concurring opinion in <u>Williams</u>, supra, the implications of
subjecting sentencing procedures to scrutiny under the equal
protection clause are ultimately impractical and disastrous:

> "[Equal protection] would require that
> the consequences of punishment be
> comparable for all individuals; the State
> would be forced to embark on the
> impossible task of developing a system of
> individualized fines, so that the total
> disutility of the entire fine, or the
> marginal disutility of the last dollar
> taken, would be the same for all
> individuals."

<u>Williams</u>, supra, 399 U.S. at 261, 90 S.Ct. at 2052, 26
L.Ed.2d at 604, (Harlen, J., concurring). Due process, on
the other hand, shifts the focus from the unsettling nature
of "equalization" to the more manageable principle of
rationality or reasonableness. 399 U.S. at 260, 90 S.Ct. at
2031, 26 L.Ed. 2d at 603. Thus, we assess the legality of
an indigent defendant's sentence in light of fundamental
fairness, implicitly recognizing the presumption in favor of
individual liberty protected by the Due Process Clause.

In the instant case, we believe the appellant's due
process rights may have been violated. We grant the State a
valid penological interest in seeking punishment, including

the requirement of restitution and recoupment. We also recognize that a maximum ten-year sentence, suspended or otherwise, may, in certain instances, be acceptable as punishment. Nevertheless, we think it arbitrary and unfair in this case to subject the appellant to the maximum sentence simply because of an apparantly unsupported notion that he may not be able to make good on the recoupment and restitution within ten years. Considering the lack of findings regarding appellant's financial resources and his ability to reimburse the proper authorities, we think the judgment of the trial court should be reconsidered. The record indicates that indigency may have been the criterion for imposing the sentence in this particular case, and we therefore view the sentence in this instance as a possible infringement upon fundamental fairness. Cf. Bearden, supra, 103 S.Ct. at 2072, 76 L.Ed.2d at 232 (due process offended when criminal defendant's probation is revoked solely because of indigency, especially when defendant has not been given an opportunity to complete requirements of restitution).

We do not say that the appellant in the immediate case may not, under appropriate circumstances, be subjected to the maximum sentence available in law. Cf. Bearden, supra (state may revoke probation of indigent defendant and imprison him for failure to make bona fide efforts to pay fines and make restitution). Due process requires only that indigency or poverty not be used as the touchstone for imposing the maximum allowable punishment. Upon remand, the trial court is free to reconsider the possibility of a ten year suspended sentence, but only upon grounds which give

fair consideration to Farrell's financial condition.

In reaching this decision, we reject arguments by the State that the provisions of appellant's sentence, especially with respect to requirements of restitution and recoupment, are not ripe for review because there is as yet no concrete evidence of any hardships. These arguments misconceive the nature of this appeal. Farrell is attacking the underlying validity of his sentence, and as such, his appeal is properly before this Court. State ex rel. Greely v. District Court (1979), 180 Mont. 317, 327, 590 P.2d 1104, 1110; State v. Simtob (1969), 154 Mont. 286, 288, 462 P.2d 873, 874.

The conviction of Stephen Farrell is affirmed. The sentence is vacated, and the case is remanded for resentencing in accordance with this opinion.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

_____
Honorable Mark P. Sullivan,
District Judge, sitting in
place of Mr. Justice Frank
B. Morrison, Jr.

_____
                    Justice

Justice John C. Sheehy dissenting:


It is an eccentric view of the law to recognize that recoupment of fraudulently acquired public moneys is a good thing, and yet to hold the District Court in error for stretching out a suspended sentence to make recoupment possible.

It is more eccentric to hold that the suspended sentence must be set aside, not on equal protection grounds, but upon lack of due process. Here the District Court, balancing the propriety of recoupment for offense after offense, and the inability of defendant to pay within three years, simply stretched out the period to make payment by the Defendant feasible. Due process means fundamental fairness. Fundamentally, the District Court was eminently fair to the Defendant, in not assessing jail time which he richly deserved, and providing instead for recoupment within the term and ability of the Defendant to pay.

Certainly, the District Judge here tried to ascertain the earning ability of the Defendant. The replies were "I really don't know." It is now remanded to find if defendant really, really did not know.

This case does not involve sending a Defendant to jail because his indigency prevented the collection of a fine, as was involved in most of the cases relied on by the majority. It involves instead a humane and compassionate approach by a District Judge to accommodate the earning ability of the Defendant, and yet to protect the public's right to recoup-

ment, and without jail time.    If that is fundamentally unfair, our system of law is skewed.

I dissent.    I would affirm the District Court in all respects.

_____
Justice

Mr. Justice Daniel J. Shea dissents and will file a written dissent later.

DISSENT OF MR. JUSTICE DANIEL J. SHEA

No. 82-391

STATE V. FARRELL

Dated: *January 6, 1985*

FILED

JAN 6 - 1985

*Ethel M. Harrison*
CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice Daniel J. Shea, dissenting:

I dissent.   The instructions given to the jury in this case were contradictory and confusing.   The majority has ignored the law governing conflicting jury instructions.   The jury was not only instructed on common scheme, it was instructed on another legal theory having no support in the evidence.   But the majority ignores the problem created by simply stating that "the jury was properly instructed on the elements of theft . . . and on the concept of common scheme, and therefore had an acceptable legal basis upon which to consider the available evidence."   But acceptable only if we turn our back on due process issues that inhere in conflicting jury instructions or in legal theories where all are not supported by substantial evidence.

It may very well be true, that in some instances, where jury instructions, taken as a whole, state the law applicable to a case, a party cannot claim reversible error as to the giving of certain instructions.   Goodnough v. State (Mont. 1982), 647 P.2d 364, 39 St.Rep 1170.   But the test of a jury instruction is not what the ingenuity of counsel can make of it, but rather the ordinary understanding of the instructions taken as a whole.   Brothers v. Surplus Tractor Parts Corporation (1973), 161 Mont. 412, 506 P.2d 1362.   In that case we reversed and remanded for a new trial because the instructions were inconsistent and contradictory to each other to a degree that would confuse the average juryman. Nor should the test of an instruction be what this Court on review can make of it.   The jury may very well wend its way through a maze of evidence and instructions, assuming they are all reconcilable, not realizing that certain instructions

are contradictory, and not realizing the verdict was tempered by that contradiction.

In McCullough v. Beech Aircraft Corp. (5th Cir. 1979), 587 F.2d 754, 759, the court remanded the case because the District Court committed reversible error in giving instructions which effectively removed from the jury's consideration a necessary theory upon which it could have found liability:

> "If the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations it cannot stand. (Citations omitted.)
>
> "In this case, the district court's jury charges was contradictory and may well have caused the jurors to misunderstand the issues presented to them for resolution."

And in State v. Napeahi (Hawaii 1976), 556 P.2d 569, 576-577, the court reversed on certain charges because two instructions were contradictory and erroneous as a matter of law:

> "The instruction of the trial court was unfair and prejudicial to the defendant and was not cured by any other instruction given at trial. (Citation omitted). An erroneous instruction, clearly prejudicial cannot be cured by another instruction which clearly states the law, but does not call the attention of the jury to the erroneous instruction."

I would vacate the judgment and grant a new trial.

_Daniel J. Shea_
Justice