No. 99-046

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 199

300 Mont. 458

5 P.3d 547

---

STATE OF MONTANA,

Plaintiff and Respondent,

v.

ROBERT DAVIS,

Defendant and Appellant.

---

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable John S. Henson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Chad Wright, Appellate Defender Office, Helena, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Micheal S. Wellenstein,

Assistant Attorney General, Helena, Montana

Fred R. Van Valkenburg, Missoula County Attorney; Kirsten LaCroix,

Deputy County Attorney, Missoula, Montana

Submitted on Briefs: February 24, 2000

Decided: July 20, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

1. ¶By Information filed in the District Court for the Fourth Judicial District in Missoula County, the Defendant, Robert Davis, was charged with negligent homicide, a felony, in violation of § 45-5-104, MCA, and failure to remain at the scene of an accident which resulted in death or personal injuries, a misdemeanor, in violation of § 61-7-103, MCA. Following a jury trial, Davis was convicted of both offenses. At the conclusion of the State's presentation of evidence, Davis moved for dismissal of the negligent homicide charge for insufficient evidence. The District Court denied Davis' motion. Davis appeals from the District Court's denial of his motion and the use of the jury instruction regarding evidence of flight. We affirm the judgment of the District Court.

2. ¶The following issues are presented on appeal:

3. ¶1. Did the District Court abuse its discretion when it denied Davis' motion to dismiss based on insufficient evidence of negligent homicide?

4. ¶2. Should the judgment of the District Court be set aside because the jury was instructed that flight by the defendant tends to prove consciousness of guilt?

## FACTUAL BACKGROUND

1. ¶On February 2, 1997, Missoula resident Gwen Taylor, and her two children, 12-year-old Twila Taylor, and 8-year-old David Taylor decided to walk to the local Pizza Hut from their residence in an area known as the Rattlesnake Canyon in Missoula, Montana. Due to harsh winter conditions in early 1997, snow berms and icy patches had formed between several sidewalks and streets, including portions of Van Buren Street in the Rattlesnake Canyon. The snow and ice made pedestrian travel in the area especially difficult because the sidewalks were intermittently covered with snow and ice and required careful maneuvering.

2. ¶Following dinner at Pizza Hut, Gwen, Twila, and David began their walk home traveling north on Van Buren. At the time they began their walk back home it was getting dark outside. Because the sidewalks were generally icy, they utilized the passable portions of the sidewalks and walked on the right-hand side of the road with their backs to traffic. Two motorists testified that as they traveled northbound

on Van Buren, they noticed Gwen, Twila, and David walking near the right-hand side of the road. The first motorist, Denise Giuliani, testified that they were walking predominately on the street, in single file, near the 1200 block of Van Buren. The second motorist, Jeanne McGinley, testified that near the 1300 block, they were walking side by side, and that Gwen was still walking on the right- hand side of the street, but that Twila and David were now walking on the snow berm which had formed over the sidewalk. McGinley further testified that she was required to swerve into the other lane of traffic in order to avoid Gwen as she walked on the right-hand side of the road.

3. ¶As Gwen, Twila, and David traveled onto the 1400 block of Van Buren, Gwen was walking on the right-hand side of the street, holding onto David's left hand, while Twila walked in front of David. An oncoming vehicle approached them driven by Anderson Cagle. At the same time, a vehicle approached them from behind driven by the Defendant, Robert Davis. Cagle testified that he noticed Davis' white Jeep Cherokee veer towards the right-hand side of the road as Davis approached the place where Gwen, Twila, and David were walking. Eight-year-old David testified that as Davis' Jeep passed them, he felt a tug on his hand and his mother disappeared.

4. ¶Davis' Jeep struck Gwen in the back of the legs and buttock region, causing her to be thrown onto the hood of Davis' Jeep and then into the air. She landed some distance from where she was struck, near a road sign.

5. ¶Immediately following the collision, Cagle pulled over and his passenger ran to a nearby house for help. Twila and David were frantically looking around and yelling for their mother, and following the discovery of their mother's body in the snow, they were lead away by another witness. Davis, however, did not stop his Jeep following the collision. Witnesses watched Davis' white Jeep continue driving north on Van Buren. Gwen was transported by emergency personnel to the hospital where she died as a result of the collision.

6. ¶When Davis arrived home, he parked his Jeep in the garage and asked his girlfriend, Tracy Kelly, to come look at his Jeep because, as he told her, he had hit a deer on the way home and damaged his car. Davis and Kelly ate dinner that night and then went to bed. When Davis and Kelly awoke the next morning, February 3, 1997, they heard a news report on the early news regarding a fatal hit and run collision involving a pedestrian and a light colored Jeep in the Rattlesnake Canyon. According to Kelly's testimony, Davis told her that he needed time to talk to an attorney before he turned himself in. Davis then drove Kelly to work in her van and returned back home.

7. ¶Later that morning, while leaving the house again, Davis was stopped by Missoula

Police Detective Michael Brady. The Missoula Police had received a tip that Davis was the owner and driver of a white Jeep which fit the description of the vehicle the police were searching for. Davis informed Detective Brady that he owned a white Jeep and that he needed to talk to his attorney prior to giving the detective any more information.

8. ¶Davis was able to contact his attorney that afternoon and later that afternoon his attorney gave Missoula Police consent to search the garage where Davis' Jeep was parked. Missoula Police evidence technician, Barbara Fortunate, testified that when she and other officers first examined Davis' Jeep that afternoon, she smelled the odor of alcohol through the Jeep's open driver's-side window.

9. ¶As Missoula Police detectives began to piece together what had occurred on the day of the accident, they learned that prior to the accident, Davis had been at the Prime Time Casino in Missoula with Kelly and her son. Kelly was doing her laundry at a laundromat next door to the Prime Time and between approximately 4:00 and 6:30 p.m., she and Davis ordered food and drinks at the Prime Time while finishing the laundry next door. Davis was drinking shots of brandy along with beer. Davis and Kelly left the Prime Time in separate cars at approximately 6:30 p.m. However, Davis forgot his briefcase at the Prime Time and returned ten minutes later to retrieve it, at which time he drank another shot of brandy.

10. ¶The two bartenders who served drinks to Davis and Kelly that afternoon testified that they believed that together they had served Davis approximately nine drinks that afternoon. The first bartender, Wendy Best, testified that she served Davis three shots of brandy and three beers between 4 and 6 p.m. The second bartender, Jacqueline Peterson, testified that after she came on duty at 6 p.m., she served Davis a shot of brandy and a beer, and an additional shot of brandy when Davis returned for his briefcase at approximately 6:40 p.m.

11. ¶On March 6, 1997, the State filed an Information charging Davis with negligent homicide, a felony, in violation of § 45-5-104, MCA, and failure to remain at the scene of an accident which resulted in death or personal injuries, a misdemeanor, in violation of § 61-7-103, MCA. Davis entered a plea of not guilty to both charges. A jury trial was held on June 10 through 24, 1998.

12. ¶On June 23, 1998, following presentation of the State's evidence, Davis made a motion to dismiss the negligent homicide charge based on insufficient evidence. The District Court denied Davis' motion, and following presentation of the Defendant's case, the jury found Davis guilty on both counts. On August 24, 1998, the District Court sentenced Davis to ten years in the Montana State Prison for negligent homicide and six months in the Missoula County Jail for failure to remain at the

scene of the accident, with both sentences to be served concurrently. Davis now appeals the District Court's denial of his motion to dismiss and the District Court's instruction to the jury regarding evidence of flight.

## STANDARD OF REVIEW

1. ¶We review a district court's denial of a motion to dismiss for insufficient evidence to determine whether the district court abused its discretion. *See State v. Berger*, 1998 MT 170, ¶ 25, 290 Mont. 78, ¶ 25, 964 P.2d 725, ¶ 25. An order dismissing a criminal action is appropriate only when no evidence exists to support a guilty verdict. *See State v. Clay*, 1998 MT 244, ¶ 29, 291 Mont. 147, ¶ 29, 967 P.2d 370, ¶ 29. We find no abuse of discretion if, after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Berger,* ¶ 25.

2. ¶The standard of review of jury instructions in criminal cases is whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case. *See State v. Johnson*, 1998 MT 289, ¶ 28, 291, Mont. 501, ¶ 28, 969 P.2d 925, ¶ 28.

## DISCUSSION

## ISSUE 1

1. ¶Did the District Court abuse its discretion when it denied Davis' motion to dismiss based on insufficient evidence of negligent homicide?

2. ¶Davis asserts that at the close of the State's case-in-chief, there was insufficient evidence for a reasonable jury to find him guilty of negligent homicide beyond a reasonable doubt. Davis contends that the State did not prove beyond a reasonable doubt that he disregarded the risk created by Gwen or that Davis' conduct immediately before the accident was a gross deviation from the reasonable person standard of care established for similar conditions. Accordingly, Davis argues that the District Court abused its discretion when it denied his motion to dismiss.

3. ¶Section 46-16-403, MCA, provides the following procedure:

When, at the close of the prosecution's evidence or at the close of all the evidence, the evidence is insufficient to support a finding or verdict of guilty, the court may, on its own motion or on the motion of the defendant, dismiss the action and discharge the defendant.

1. ¶Section 45-5-104, MCA, provides that "a person commits the offense of negligent homicide if the person negligently causes the death of another human being." Section 45-2-101(42), MCA, defines "negligently" as:

[A] person acts negligently with respect to a result or to a circumstance described by a statute defining an offense when the person consciously disregards a risk that the result will occur or that the circumstance exists or when the person disregards a risk of which the person should be aware that the result will occur or that the circumstance exists. The risk must be of a nature and degree that to disregard it involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Gross deviation" means a deviation that is considerably greater than lack of ordinary care.

1. ¶The State points out that Davis' contention is based on the argument that the State failed to present evidence beyond a reasonable doubt that Davis disregarded the risk created by Gwen, and is not based on the risk created by Davis' alcohol consumption prior to the accident. The State asserts that Davis' consumption of approximately nine drinks prior to driving his vehicle was the risk disregarded by Davis, and his conduct was clearly a gross deviation from a reasonable person's standard of conduct.
2. ¶At trial, Davis argued the following to the District Court in support of his motion to dismiss:

Taking the evidence in the light which is best to the Prosecution is, as stated by Detective Reid, Mr. Davis was driving in his own lane of traffic, he was not going any faster than Mr. Cagle, who it was agreed was driving in a safe manner. There is not evidence of intoxication, as the State's own expert stated he does not know and he could not know and he can't express an opinion as to either the effect of any alcohol on Mr. Davis or its degree.

1. ¶In response, the State argued as follows:

[T]here has been evidence of significant alcohol consumption, and there has been evidence by several witnesses that the Defendant was not, in fact, in the portion of the road where he should have been in violation of Montana rules, regulations and statutes and

ordinances. And I would ask the Court to deny the Defendant's motion on those grounds.

1. ¶The District Court denied Davis' motion and concluded that the "State has met its burden of presenting a prima facie case." After reviewing the record and drawing permissible inferences in favor of the prevailing party, we agree with the District Court.

2. ¶The State presented substantial evidence of Davis' alcohol consumption prior to the accident. Prime Time bartender Wendy Best testified that during her shift on February 2, 1997, between 4 and 6 p.m., she served Davis six drinks, including three brandies and three beers. Jacqueline Peterson also testified that during her shift as a bartender at the Prime Time on February 2, 1997, beginning at 6 p.m., she served Davis an additional two brandies and one beer. Admittedly, the State was unable to present evidence of Davis' blood alcohol content at the time of the accident, however, this was due solely to Davis' failure to remain at the scene. Moreover, the jury is free to draw inferences from the evidence presented at trial. *See State v. Heffner*, 1998 MT 181, ¶ 30, 290 Mont. 114, ¶ 30, 964 P.2d 736, ¶ 30; § 26-1-501, MCA.

3. ¶The State's expert, Phillip I. Lively, director of the breath analysis program for the Division of Forensic Sciences, Department of Justice, State of Montana, testified regarding the effect of alcohol on a person:

Q. [W]ould you have an opinion as to whether or not an individual who weighed approximately 200 pounds who consumed five ounces of brandy as well as four of those St. Pauli Girl beers in a two and a half hour period of time, do you have an opinion as to whether that individual would have approached the range of diminished ability to perform a multiple attention task?

A. Well, I mean, alcohol is a drug that has a specific function. It comes in and it alters your brain function, that's its pharmacological action. An individual who consumed five ounces of brandy and how many, four beers? Something like that? Um in a two-hour period, I mean, that's - - that's a good quantity of alcohol to do in two hours. My assessment is that there is alcohol on board on that individual, and that that individual is experiencing the effects of alcohol at that time.

1. ¶Even though both bartenders testified that Davis did not appear to be intoxicated that evening, the State's expert, Lively, distinguished between being intoxicated and being under the influence:

Well, when we think of people who are drunk or intoxicated, we think of the typical - - stereotypical thing that we see on TV or whatever of the individual who staggers and slurs their speech; and, you know, may be very volatile and so forth. And, yes, people do become that way under the influence of alcohol. But the mental faculties, the effect on the mental faculties, the depression of your judgmental centers, the effect that it has on the sensory occurs well before many of these particular signs manifest themselves. You know, I guess one could say that all drinkers are under the influence, but not all people that are under the influence are, quote, drunk; but they are being affected by the drug, even though it's not visibly manifested.

1. ¶Additionally, the testimony of eyewitness Cagle regarding Davis' driving prior to and immediately following the accident supports the State's allegation that Davis' driving subsequent to substantial alcohol consumption was a gross deviation from the standard of conduct of a reasonable person, and that Davis consciously disregarded that risk. Cagle was traveling southbound on Van Buren in his Isuzu Trooper and his vehicle passed Davis' Jeep almost simultaneously with Davis' Jeep's collision with Gwen. Cagle testified that just prior to the accident, Davis' Jeep began to drift steadily towards the right-hand side of the road. Cagle additionally testified to the following:

Q. And you didn't have any difficulty at all seeing the pedestrians?

A. No.

. . . .

Q. About how much time was there between the time you saw the vehicle veering off to

the side of the road and the time that the collision occurred?

A. Maybe three to five seconds.

. . . .

Q. And did the vehicle in any way attempt to correct?

A. No.

. . . .

Q. What did you see the Jeep do after it hit the lady?

A. I didn't see what it did, but I do remember hearing a loud engine noise as if it was taking off, getting out of there.

1. ¶Moreover, Kelly testified to the following at trial:

Q. What happened when he [Davis] got home?

A. He walked into the house. I was cooking chicken in the kitchen, and he asked me to come and look at his car, because he had just hit a deer.

Considering that Gwen weighed approximately 250 pounds at the time of the accident and

landed on the hood of Davis' vehicle before she was thrown into the air, the fact that Davis was under the impression that he hit a deer on the way home also infers that Davis was under the influence of alcohol at the time of the accident.

1. ¶We have previously held that intoxication can be the basis for a finding of criminal negligence. *See State v. Cook* (1982), 198 Mont. 329, 333, 645 P.2d 1367, 1370, (citing *State v. Kirkaldie* (1978), 179 Mont. 283, 292, 587 P.2d 1298, 1304.)

2. ¶After viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of negligent homicide beyond a reasonable doubt. The jury could reasonably have found from the evidence presented that Davis consciously disregarded the risk posed by his driving under the influence of alcohol, and that his conduct immediately before, during, and after the accident reveals a gross deviation from the standard of conduct that a reasonable person, not under the influence of alcohol, would have observed. Accordingly, we conclude that the District Court did not abuse its discretion when it denied Davis' motion for a directed verdict of acquittal on the charge of negligent homicide.

## ISSUE 2

1. ¶Should the judgment of the District Court be set aside because the jury was instructed that flight by the defendant tends to prove consciousness of guilt?

2. ¶We recently determined in *State v. Hall*, 1999 MT 297, 56 St.Rep. 1190, 991 P.2d 929, that a jury instruction on flight may be an unnecessary comment on the evidence by the trial court, and that the better policy in future cases where evidence of flight has been properly admitted is to limit comment to counsel, rather than the court. *See Hall*, ¶ 46. Therefore, we concluded that jury instructions on the significance of flight should no longer be given. *See Hall*, ¶ 48.

3. ¶In this case, the District Court gave the following jury instruction:

If you are satisfied that the crime charged in the Information has been committed by someone, then you may take into consideration any testimony showing or tending to show flight by the Defendant. This testimony may be considered by the jury as a circumstance tending to prove a consciousness of guilt, but it is not sufficient of itself to prove guilt. The weight to be given such circumstance and significance if any to be attached to it are matters for the jury to determine.

1. ¶Davis did object to the flight instruction at trial, however, not because it was an improper comment on the evidence, but for the following reason:

We object, Your Honor, simply noting that there's no actual evidence of flight in this case. All the evidence tends to show lack of knowledge on Mr. Davis' part as to the critical fact which would be attendant to flight that would acknowledge that he hit a human being.

1. ¶Before this Court can consider the application of *Hall*, Davis must show that he made a proper objection in the District Court, i.e., an objection on the basis now alleged. *See* § 46-16-410(3), MCA; *State v. Hatten*, 1999 MT 298, ¶ 67, 56 St.Rep. 1198, ¶ 67, 991 P.2d 939, ¶ 67. By first raising the issue in the District Court through a specific objection, the defendant enables the State, as well as the District Court, to avoid or correct the purported error. *See State v. McKeon* (1997), 282 Mont. 397, 409, 938 P.2d 643, 650.

2. ¶For example, in *Hatten*, this Court declined to reverse Hatten's conviction on the basis of the District Court's flight instruction because Hatten did not claim the instruction was an unnecessary comment on the evidence in the District Court:

In the case before us, Hatten, unlike the defendant in *Hall*, did not argue, either before the trial court or on appeal, that the instruction on flight was an improper comment on the evidence, thus, it would be improper for us to reverse the District Court on that basis. "A party may not assign as error any portion of the instructions or omission from the instructions unless an objection was made specifically stating the matter objected to, *and the grounds for the objection*, at the settlement of the instructions." *State v. Grimes*, 1999 MT 145, ¶ 37, 982 P.2d 1037, ¶ 37, 56 St.Rep. 571, ¶ 37 (emphasis added) (quoting § 46-16-410(3), MCA). "A party's assertion of error 'must stand or fall on the ground relied on by the trial court' " *State v. Henderson* (1994), 265 Mont. 454, 459, 877 P.2d 1013, 1016 (quoting *State v. Dept' of Highways v. DeTienne* (1985), 218 Mont. 249, 256, 707 P.2d 534, 538.

*Hatten, ¶ 67. Here, like the defendant in Hatten, Davis did not raise a Hall-type objection to the flight instruction during the settlement of instructions in the District Court. Accordingly, Davis has waived appellate review of his claim that the flight instruction offered in his case was an unnecessary comment*

*on the evidence.*

1. ¶Furthermore, in anticipation of the claim that counsel was ineffective for not making the proper objection we note that in *Hall*, we stated:

[I]n the instant case, we find no reversible error because there was sufficient evidence that flight had taken place and the instruction included the qualification that such flight is not by itself sufficient evidence of guilt but is only one circumstance to be considered by the jury.

*Hall, ¶ 47.*

1. ¶We conclude that in this case, like *Hall*, there was sufficient evidence that flight had taken place and that because the jury instruction contained the qualification that flight itself was not sufficient evidence of guilt, the jury instruction on flight was not prejudicial to Davis.
2. ¶Accordingly, we affirm the District Court.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART