No. 00-544

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 13

STATE OF MONTANA,

      Plaintiff and Respondent,

v.

DONNIE NOLAN,

      Defendant and Appellant.

FILED

JAN 30 2003

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone,
Honorable G. Todd Baugh, Judge Presiding

COUNSEL OF RECORD:

    For Appellant:

        Melissa Edwards, Attorney at Law, Billings, Montana

    For Respondents:

        Honorable Mike McGrath, Attorney General; Micheal S.
Wellenstein, Assistant Attorney General, Helena, Montana

        Dennis Paxinos, County Attorney, Billings, Montana

Submitted on Briefs:  July 25, 2002

Decided:  January 30, 2003

Filed:

_____
Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1 Donnie Nolan appeals from the judgment and sentence entered by the Thirteenth Judicial District Court, Yellowstone County, on a jury verdict convicting him of criminal endangerment and resisting arrest. We affirm.

¶2 We address the following restated issues:

¶3 1. Did the District Court err by instructing the jury on flight?

¶4 2. Did the District Court err by improperly considering Nolan's poverty and social relationships in determining his sentence?

## BACKGROUND

¶5 On December 9, 1998, the State of Montana charged Nolan by information with the felony offenses of assault on a peace officer and criminal endangerment. The case proceeded to a jury trial at which the following factual information was elicited through testimony.

¶6 During the early morning hours of December 6, 1998, Billings Police Department Officer Shawn Finnegan observed a vehicle traveling 52 miles an hour in a 35 mile-per-hour speed zone. Finnegan activated the overhead lights and siren on his patrol car, but the driver did not pull over. Instead, the driver continued driving at high speed through a residential neighborhood. Finnegan was unable to safely match the other vehicle's speed because of the ice and snow on the road and the parked cars on both sides of the street. The speeding vehicle proceeded past two stop signs without slowing and eventually crashed into multiple parked vehicles, which brought it to a stop.

2

¶7    Denise Boggio ran from the passenger side of the crashed vehicle, screaming and crying. Her face was bloodied. After tending to Boggio, Finnegan observed that no one else was in the vehicle. Boggio told Finnegan that Nolan was the driver, and described him and his clothing. Nolan and Boggio had argued while driving, he had hit her and she was scared because of his driving, but he had not responded to her requests to be let out of the vehicle.

¶8    Cindy Johnson was asleep in her home, located near the crash scene, when she was awakened by the sound of someone coming in her front door. She got out of bed and encountered Nolan–a stranger to her–in her house. He was bleeding and stated that someone was trying to kill him. When Johnson said she was going to call the police, Nolan told her not to do so, saying that he had been trying to sell drugs to the person who tried to kill him. Johnson called the police, but Nolan left the house before officers arrived.

¶9    Shortly thereafter and near the same area, Officer David Dierenfield spotted Nolan and asked to talk to him. Nolan told Dierenfield he was not who they were looking for and asked to be left alone. Dierenfield then told Nolan he was under arrest and asked him to remove his left hand from his coat pocket. Nolan kept his hand in his pocket and began to walk towards Dierenfield. After several orders to show his hands, Nolan continued to walk towards Dierenfield with his hand in his pocket. Dierenfield drew his weapon and moved behind his patrol car for cover. As he continued towards Dierenfield, Nolan said "Go ahead and shoot." Eventually Nolan removed his empty hand from his pocket. Dierenfield again

3

told Nolan he was under arrest, but Nolan turned and walked away. Dierenfield holstered his weapon and followed Nolan, who began to run.

¶10    When Dierenfield caught Nolan, the two men fought, both of them slipping on the ice. Nolan broke free and ran. Dierenfield caught him, and the two fought again. Several other officers arrived and were able to subdue and handcuff Nolan after pepper-spraying him. During the altercation, Dierenfield received cuts and scrapes to his knuckles and knee, and one of his fingernails was partially torn off.

¶11    The jury ultimately convicted Nolan of criminal endangerment, a felony, but could not agree on a verdict on the felony charge of assault on a peace officer. Instead, the jury returned a guilty verdict on the lesser-included misdemeanor offense of resisting arrest.

¶12    Nolan did not appear at his original sentencing hearing, and the District Court issued a warrant for his arrest. Nolan was arrested several months later in southern California and returned to Montana. On May 8, 2000, the District Court sentenced him to five years in the Montana State Prison on the criminal endangerment conviction and six months in the Yellowstone County Detention Facility on the resisting arrest conviction, with the sentences to run concurrently. The District Court listed numerous reasons for its sentence. Nolan appeals.

DISCUSSION

¶13    1. Did the District Court err by instructing the jury on flight?

4

¶14 After Nolan's trial, we determined in *State v. Hall*, 1999 MT 297, ¶ 46, 297 Mont. 111, ¶ 46, 991 P.2d 929, ¶ 46, that flight instructions improperly inject argument into a trial court's instructions and that such comment should be limited to counsel. We concluded that, "in future cases," even where evidence of flight has been properly admitted, a flight instruction should not be given. *Hall*, ¶¶ 46, 48.

¶15 In the present case, Nolan objected to the State's proposed flight instruction on the grounds that the instruction was not timely filed and the circumstances did not warrant a flight instruction. The District Court overruled the objections and instructed the jury as follows:

> If you are satisfied that the crime charged in the information has been committed by someone, then you may take into consideration any testimony showing, or tending to show, flight by the defendant. This testimony may be considered by the jury as a circumstance tending to prove a consciousness of guilt, but is not sufficient of itself to prove guilt. The weight to be given such circumstance and the significance if any, to be attached to it, are matters for the jury to determine.

Nolan asserts entitlement to the application of *Hall* to his case.

¶16 Our general rule is that an appellant must show that an objection was made at trial on the same basis as the error asserted on appeal. *See State v. Davis*, 2000 MT 199, ¶ 38, 300 Mont. 458, ¶ 38, 5 P.3d 547, ¶ 38 (citations omitted). Requiring a defendant to raise the issue in the district court through a specific objection gives the prosecution and the trial court the ability to avoid or correct the purported error. *Davis*, ¶ 38.

¶17 Since *Hall*, we have rejected–on three occasions–appellants' arguments against a flight instruction when the proper and specific objection was not made at trial. *See Davis*, ¶¶ 38-39; *State v. Baker*, 2000 MT 307, ¶¶ 29-30, 302 Mont. 408, ¶¶ 29-30, 15 P.3d 379, ¶¶ 29-30; *State v. Hatten*, 1999 MT 298, ¶ 67, 297 Mont. 127, ¶ 67, 991 P.2d 939, ¶ 67. When the defendant does not raise a "*Hall*-type" objection to the flight instruction during the settlement of instructions in district court, appellate review of that claim is waived. *Davis*, ¶ 39. Nolan concedes he did not raise the proper objection at trial.

¶18 Here, however, unlike the defendants in *Davis*, *Baker* and *Hatten*, Nolan asserts entitlement to consideration of his *Hall*-related claim on appeal pursuant to § 46-20-701(2), MCA. Section 46-20-701(2), MCA, allows a claim of error based on constitutional rights to be raised on appeal even when not objected to at trial *if* the appellant establishes the error was prejudicial *and* "the right asserted in the claim did not exist at the time of trial and has been determined to be retroactive in its application[.]" Nolan contends his constitutional right to a fair trial was violated by the giving of the flight instruction and the error was prejudicial. We need not consider these contentions, however, because § 46-20-701(2)(a), MCA, applies only where the right asserted "has been determined to be retroactive in its application." We stated without equivocation in *Hall* that our ruling that flight instructions should not be given applied only to "future trials." *Hall*, ¶¶ 46, 48. In other words, the ruling was prospective, not retroactive, in its application and Nolan's trial occurred before that decision.

6

¶19 We conclude that Nolan waived his right to raise a *Hall*-related objection on appeal under *Davis*, which requires that the proper objection be made at trial. We further conclude that Nolan has not met the requirements of § 46-20-701(2)(a), MCA, for raising a claimed constitutional error on appeal to which objection was not made at trial. We hold, therefore, that Nolan has not established error in the District Court's giving of the flight instruction.

¶20 2. Did the District Court err by improperly considering Nolan's poverty and social relationships in determining his sentence?

¶21 The District Court sentenced Nolan to five years for criminal endangerment and six months for resisting arrest. Under § 45-5-207(2), MCA, the maximum sentence for criminal endangerment is ten years. Under § 45-7-301(3), MCA, the maximum sentence for resisting arrest is six months. The sentences are within statutory parameters. Nolan nevertheless contends his sentence violates § 46-18-101(3)(c), MCA, and his constitutional due process rights. We address each contention in turn, mindful that we review criminal sentences for legality only, confining our review to whether the sentence is within statutory parameters. Our review of constitutional questions is plenary. *State v. Pritchett*, 2000 MT 261, ¶¶ 6, 27, 302 Mont. 1, ¶¶ 6, 27, 11 P.3d 539, ¶¶ 6, 27.

¶22 Section 46-18-101(3)(c), MCA, which is part of Montana's correctional and sentencing policy, provides, "Sentencing practices must be neutral with respect to the offender's race, gender, religion, national origin, or social or economic status." Nolan contends the record indicates his sentence was based on the prohibited factors of "social or

7

economic status." We note that the statute does not define "economic status," nor does either party clearly do so. Nolan apparently equates "economic status" to indigency or poverty and, for purposes of this opinion only, we will do the same.

¶23 Nolan presented the testimony of three witnesses during the sentencing hearing. The thrust of the testimony was that Nolan needed counseling, not prison. In addition, each of Nolan's witnesses, including Boggio, testified in some fashion that Nolan is a good father. Neither the State nor the District Court inquired about this subject during Boggio's testimony. After Nolan's second witness, Cherise Lynn McArthur, testified that Nolan was a good father, the court inquired how many children Nolan has, and McArthur responded "I believe he has five–four?" On cross-examination, the State also inquired about the number of Nolan's children. On cross-examination of Nolan's third witness, Cassandra Vargas, the State asked how many children Nolan has, and Vargas responded "Um, five–six, actually, I'm sorry." Almost immediately thereafter, the State asked Vargas whether Nolan supports any of the children, and she stated "not that I know of." The transcript reflects that Vargas then laughed. Nolan also gave a lengthy statement to the court and talked about how much he loves his children and they love him. The court inquired about the extent to which he supports the children and Nolan's various answers reflect that the support, if any, is sporadic. He also acknowledged a $40,000 hospital debt on which he has paid nothing.

¶24 In its written sentencing order, the District Court listed numerous reasons for the sentence imposed, including the violence of the felony offense at issue, Nolan's 25 traffic-

related convictions, 2 prior felony convictions involving violence, and the numerous opportunities previously given Nolan to be a responsible, law-abiding citizen. In addition, the court considered that "while employed [Nolan] failed to be responsible towards paying any debts including non-support for the number of dependents."

¶25 Nolan argues the District Court relied on his poverty as a factor in sentencing in violation of § 46-18-101(3)(c), MCA. As set forth above, the record does not support this argument. While the court noted Nolan's failure to pay his debts, the record does not indicate that poverty was a factor. As a general matter, failure to pay debts does not equal poverty. Moreover, the court's observation that Nolan did not make payments toward his debts was expressly limited to times when Nolan was employed. We conclude the District Court did not rely on Nolan's alleged poverty in violation of § 46-18-101(3)(c), MCA.

¶26 Nolan also contends his sentence violates § 46-18-101(3)(c), MCA, because the District Court focused on his "social status" by inquiring about such things as the number of children he had fathered out of wedlock. His contention is without merit.

¶27 First, Nolan did not object to the inquiries at the time they were made, as required by Rule 103(a)(1), M.R.Evid. Second, Nolan opened the door to the court's inquiries by presenting both witness testimony and his own statement regarding being a good father and loving his children. Having done so, he cannot now complain that the court inquired further into those subjects. Finally, the court's sentencing order, from which this appeal is taken, does not mention or rely on the number of Nolan's children. We conclude the District Court

9

did not rely on Nolan's social status in violation of § 46-18-101(3)(c), MCA, in sentencing Nolan.

¶28   We next turn to Nolan's claim that his sentence violates his constitutional due process rights. He first asserts the District Court's violation of § 46-18-101(3)(c), MCA, resulted in a violation of his due process rights. Having determined above that the court did not violate § 46-18-101(3)(c), MCA, we need not address this contention further.

¶29   Nolan also makes a broader due process argument, however. Quoting from *State v. Farrell* (1984), 207 Mont. 483, 497, 676 P.2d 168, 176 (citation omitted), he asserts the court's consideration of his "financial background in setting . . . a sentence [was] so arbitrary or unfair as to be a denial of due process." He also relies on *Pritchett*, ¶¶ 35, 37, where we held that a defendant's due process rights were violated when the district court record led us to conclude the sentence was based on indigency. *Farrell* and *Pritchett* are readily distinguishable.

¶30   In *Farrell*, the defendant was convicted of theft of public assistance funds and was given the maximum ten-year sentence, all suspended. *Farrell*, 207 Mont. at 487, 676 P.2d at 171. The sentencing court stated that it was imposing the maximum sentence, suspended, because it did not think the defendant could pay the restitution imposed in less than 10 years. *Farrell*, 207 Mont. at 494, 676 P.2d at 174. The defendant appealed the sentence.

¶31   We stated in *Farrell* our belief that his due process rights might have been violated because indigency may have been the sentencing criterion, which would infringe on the

10

fundamental fairness protected by due process rights. *Farrell*, 207 Mont. at 498, 676 P.2d at 177 (citation omitted). "Due process requires only that indigency or poverty not be used as the touchstone for imposing the maximum allowable punishment." *Farrell*, 207 Mont. at 499, 676 P.2d at 177.

¶32 In *Pritchett*, the defendant was convicted of burglary and given the maximum 20-year sentence, all suspended. *Pritchett*, ¶ 26. The record revealed that the person who prepared the presentence investigation report explicitly recommended the sentence "[t]o give the Defendant adequate time to pay off the restitution." *Pritchett*, ¶ 3. We determined that, while the sentencing court did not expressly state it was doing so, sufficient evidence of record supported a conclusion that the length of the sentence was based on the defendant's indigency, thus violating his due process rights. *Pritchett*, ¶¶ 30, 34-35.

¶33 In significant contrast to *Farrell* and *Pritchett*, Nolan did not receive the maximum sentence for his felony offense and his sentence did not include restitution. Moreover, it was clear in *Farrell* and *Pritchett* that those defendants' indigency was the "touchstone" for imposing the maximum allowable punishment. Here, the District Court listed numerous reasons for its sentence, including a criminal record of violent felony offenses. Only one of the considerations was that Nolan did not pay his debts "while employed" and, as discussed above, failure to pay debts while employed is not equivalent to poverty or indigency. Finally, it is clear in this case that the passing reference to Nolan's failure to pay his debts was not

11

"the touchstone" of his sentence. We conclude that Nolan's due process rights were not violated.

¶34 Having found no statutory or constitutional violation, we hold the District Court did not err in sentencing Nolan.

¶35 Affirmed.

_____
Chief Justice

We concur:

_____
_____
_____
Justices

12