NO. 93-167

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

THE STATE OF MONTANA,

     Plaintiff and Respondent,

-v-

GREGORY JOHN MERGENTHALER,

     Defendant and Appellant.

FILED

JAN 2 0 1994

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          William F. Hooks, Appellate Defender, Helena, Montana

     For Respondent:

          Hon. Joseph P. Mazurek, Attorney General, Elizabeth Griffing, Assistant Attorney General, Helena, Montana: Mike McGrath, Lewis and Clark County Attorney, Carolyn Clemens, Deputy County Attorney, Helena, Montana

Submitted on Briefs: December 22, 1993

Decided: January 20, 1994

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

Gregory Mergenthaler (Mergenthaler) appeals from a Judgment and Commitment of the First Judicial District Court, Lewis and Clark County, based on a jury verdict convicting him of negligent homicide. We affirm.

The issues on appeal are as follows:

1.   Did the District Court err in denying Mergenthaler's motion to dismiss at the conclusion of the State's case?

2.   Did the District Court err in allowing autopsy slides and a photograph of the victim, while alive, to be presented to the jury?

Mergenthaler began dating Donna Weinzetl (Donna) in November, 1991. Donna was the mother of Ashley Weinzetl (Ashley), who was born on November 29, 1990. Mergenthaler was convicted of negligent homicide in connection with the death of thirteen-month old Ashley on January 23, 1992.

A few weeks prior to her death, on the evening of January 12, 1992, Ashley was hospitalized because of the flu, which caused diarrhea and dehydration. She also suffered a febrile seizure, a common seizure which occurs in young children suffering from a fever **or** febrile illness. At the **time** she was hospitalized, she was placed on an I.V. and tested for meningitis. Dr. John Reynolds, the admitting doctor, saw no bruises or other injuries on Ashley. Dr. Reynolds testified that Ashley responded to treatment well, and by the morning of January 13, 1992, appeared to be a **"nice** normal happy baby." Ashley stayed in the hospital until

2

January 15, 1992, in order to allow Dr. Reynolds time to complete testing of her urine, blood, and spinal fluids. When she was discharged, Dr. Reynolds instructed Donna to feed the child Pedialyte, an oral electrolyte solution, and prescribed amoxicillin for an ear infection.

On January 18, 1992, Carole Keele, Donna's mother, babysat Ashley while Donna worked. Ms. Keele testified that Ashley ate normally that day. When Ms. Keele bathed Ashley, she noticed that Ashley had a bruise on her foot from where the I.V. had been placed, but testified that there were no other bruises on Ashley. She also testified that Ashley did not appear to be ill that day.

The next day, Ashley ate a normal breakfast, then Donna and Ashley attended church. Church members testified at trial that Ashley was not as active that day as she usually was, but that she appeared healthy and had no bruises or marks on her face. After church, Ashley ate lunch, took a nap, and played in the afternoon.

Later that afternoon, Mergenthaler called Donna and said he would come and pick Donna and Ashley up to visit at Mergenthaler's house. A short time after arriving there, Donna went to the grocery store to pick up fixings for dinner, and to rent a video. When Donna left the house, Ashley was asleep on top of Mergenthaler's bed. When Donna returned, Mergenthaler was holding Ashley and she was undressed except for a diaper. Mergenthaler told Donna that Ashley had vomited on the sheets and that he put her on the couch to run a bath. When he came out of the bathroom, Ashley was lying on the floor; Mergenthaler told Donna that Ashley

3

fell off the couch. At this time, Donna noticed that Ashley had a bruise on the right side of her head.

Mergenthaler did not like what Donna had purchased for dinner, so she went back to the store and left Ashley with him. She also went to her apartment to get pajamas for Ashley. Upon her return to Mergenthaler's apartment, she prepared dinner and they watched the video. She also fed Ashley, who then went to sleep around 9:00 p.m. Donna then made another trip to her apartment to pick up blankets for Ashley. Upon her return, she decided to stay the night at Mergenthaler's apartment, so she returned to her apartment a last time to pick up her work clothes and curling iron.

Mergenthaler, Donna, and Ashley were sleeping in the same bed and, between 10:00 and 11:OO p.m., Ashley woke up crying and appeared to be having trouble breathing. Donna got up and dressed herself and Ashley in order to go to the emergency room. At that time, Donna noticed the bruises on Ashley's head were swollen. Mergenthaler asked to hold Ashley, which Donna allowed him to do. Within about five minutes, Ashley began breathing normally. At that time, Mergenthaler convinced Donna not to take Ashley to the emergency room.

During that night, Mergenthaler and Donna kept checking on Ashley, shining a small flashlight into her eyes every hour. Ashley slept through the night and her breathing appeared normal.

At 4:30 a.m. on January 20, 1992, Donna awoke and got ready for work. She left Mergenthaler's house at 5:30 a.m. and discovered her car would not start. Mergenthaler assisted her in

4

getting the car started, then Donna left for work, leaving Ashley in Mergenthaler's care.

Mergenthaler testified that he went back to bed after helping Donna start her car, but awoke around 6:30 a.m. when Ashley began crying. Mergenthaler then changed her diaper and tried to give her a bottle, which she refused. He testified that he did feed her three jars of baby food and that she then "passed out, just fell asleep again." Mergenthaler then watched television and later realized he had not given Ashley the amoxicillin. When he went to give her the medicine, she was barely breathing. Mergenthaler testified that he tried to wake her up by shaking and slapping her and that he tried to pry her mouth open but her jaw was locked.

When he was unable to get Ashley to respond, Mergenthaler called his mother, who told him to call Donna. At about 9:00 a.m., Donna received a telephone call from Mergenthaler, telling her that Ashley's jaw was locked and that her body was limp. Donna testified that she told Mergenthaler to call 911, but he denies this statement. Donna called her doctor's office and the emergency room, then called Mergenthaler's apartment. When Mergenthaler answered the telephone, he told Donna the paramedics were there.

Donna went to the hospital and, upon her arrival, found that Ashley was in a trauma unit in critical condition. She was in a coma and unresponsive, with severe retinal hemorrhages. A CT scan showed that there were many areas of free bleeding within her head, including subarachnoid bleeding (at the bottom of the brain) and subdural bleeding (between the covering of the brain and the brain

5

itself). The attending physician, Dr. Reynolds, diagnosed her condition as "whiplash shaken infant syndrome." Dr. Reynolds testified that he had never seen a child injured in that manner from revival efforts, and further testified that Ashley's injuries were not consistent with a fall from a couch. Dr. Reynolds also testified that Ashley could not have eaten breakfast the morning of January 20, 1992, let alone have eaten three jars of baby food. He believed the injuries had likely occurred within the previous twenty-four to forty-eight hours.

That afternoon, Ashley was flown to the hospital in Great Falls for specialized care. Dr. Ruggerie, a specialist in pediatric critical care, testified that, when Ashley arrived at the Great Falls hospital, his working diagnosis was child abuse. Dr. Ruggerie testified that Ashley's brain was so swollen that it had herniated, pushing the brain out of the skull through the base of the skull. He found her eyes dilated with significant retinal bleeding, with one retina partially detached.

Dr. Ruggerie noted significant external head injuries, including swelling on the right side of her face and bruises on both sides of the face and over the ears. Ashley also had small pinpoint bruising around the base of her head. Dr. Ruggerie agreed that the injuries were consistent with those of a baby who had been severely shaken. He also opined that the injuries had occurred within twenty-four hours of presentation.

Ashley died on January 23, 1992. Dr. Henneford performed an autopsy, which showed that she had died from swelling of the brain

6

and bleeding within the cranial vault. The autopsy revealed that Ashley had severe bleeding within the brain, hemorrhaging of her retina, and one partially detached retina. Dr. Henneford testified that the hemorrhaging and bleeding were consistent with a "shaken baby episode." He did not believe that the injuries could be the result of a fall from a couch or from revival efforts. **Dr.** Henneford believed the injuries inflicted on Ashley occurred three to four days before her death on January 23, 1992.

All three doctors who testified at trial agreed that Ashley's head injuries could not have occurred through a fall from the couch. They also agreed that the health care providers could not have caused the significant bruising, nor could the bruising have occurred through choking or retching. Dr. Reynolds and Dr. Ruggerie confirmed that the injuries had no relation to the flu symptoms Ashley had earlier in the week, and agreed that none of the injuries were indicative of a febrile seizure.

On January 28, 1992, Mergenthaler was charged by information with negligent homicide. The above evidence was presented at a trial held August 31, 1992 through September 3, 1992, and the jury returned a guilty verdict. After a hearing on December 7, 1992, Mergenthaler was sentenced to ten years in prison and was ordered to pay restitution for all of Ashley's medical and funeral expenses as a condition of parole. **From** that Judgment and Commitment, Mergenthaler appeals.

## I - MOTION TO DISMISS

Mergenthaler contends that the District Court erred in denying

his motion to dismiss the information at the conclusion of the State's case. Essentially, he argues that there was insufficient evidence to support the charge that he is the person who inflicted the injuries on Ashley. We disagree.

When the issue on appeal is whether there was sufficient evidence to support a jury verdict, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. McLain (1991), 249 Mont. 242, 246, 815 P.2d 147, 150. A directed verdict of acquittal is appropriate only when there is no evidence to support a guilty verdict. State v. Haskins (1992), 255 Mont. 202, 210, 841 P.2d 542, 547.

Mergenthaler was charged with negligent homicide, which is defined as negligently causing the death of another human being. Section 45-5-104, MCA (1991). "Negligently" is defined as follows:

> a person acts negligently with respect to a result or to a circumstance described by a statute defining an offense when he consciously disregards a risk that the result will occur or that the circumstance exists or when he disregards a risk of which he should be aware that the result will occur or that the circumstance exists. The risk must be of such a nature and degree that to disregard it involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Gross deviation" means a deviation that is considerably greater than lack of ordinary care. . . .

Section 45-2-101(37), MCA (1991). Thus, in order to find Mergenthaler guilty of negligent homicide, the jury had to find that he grossly deviated from the standard of ordinary care in his conduct with Ashley. After reviewing the entire record in this

8

case in the light most favorable to the State, we conclude that the State introduced sufficient evidence to establish all the essential elements of the crime beyond a reasonable doubt.

Mergenthaler himself admitted that he shook and slapped Ashley, allegedly in an attempt to get her breathing. In addition, strong evidence was presented to show that Mergenthaler had severely injured Ashley while Donna was gone. All the doctors who testified at trial concluded that Ashley's head injuries could not have occurred through a fall from the couch, as Mergenthaler claimed. In addition, all the doctors agreed that the injuries could not have occurred when Ashley vomited or if she was choking or retching. Rather, the evidence showed that Ashley had been severely shaken and that this shaking caused her brain to swell and ultimately caused her death.

It is clear **that** circumstantial evidence may be used to prove any element of an offense. State v. Lynn (1990), 243 Mont. 430, 435, 795 P.2d 429, 433. All the evidence presented at trial indicated that Ashley was normal and healthy when she went to Mergenthaler's apartment on January 19, 1992. The evidence indicated that the injuries were acute and occurred on that day. Mergenthaler had custody and control over Ashley during the period of time when the bruises first appeared on her face. The jury could readily infer that an incident occurred where Ashley was injured during the time Donna was away from Mergenthaler's apartment. While Mergenthaler could not be compelled to testify, he chose to do so, but did not offer any rational explanation for

9

Ashley's severe injuries incurred while she was in his care.

In fact, Merqenthaler's testimony at trial was discredited by the State's evidence. He claimed that Ashley had fallen off the couch on January 19, 1992, and likely received some facial bruises then. However, all the doctors who testified concluded that the bruises on Ashley's face could not have been caused by falling off the couch. In addition, Merqenthaler claimed that Ashley ate three jars of baby food on January 20, 1992. However, Dr. Reynolds testified that there was no possible way Ashley could have eaten that amount of food, given her condition at the time she was admitted to the hospital.

We conclude that the State provided a significant amount of evidence upon which a rational trier of fact could find Mergenthaler guilty beyond a reasonable doubt. Therefore, we hold that the District Court properly denied Merqenthaler's motion to dismiss at the conclusion of the State's case.

## II - AUTOPSY SLIDES AND PHOTOGRAPH

Mergenthaler contends that the District Court erred in allowing the State to present autopsy slides and a photograph of Ashley, while alive, to the jury. We disagree.

Our standard of review relating to discretionary trial court rulings is whether the trial court abused its discretion. Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 470, 475, 803 P.2d 601, 603-04.

At trial, Dr. Henneford, the physician who performed the autopsy on Ashley, referred to slides taken during the autopsy when

10

he was explaining the nature of the injuries to the jury. It is well established that the trial courts have wide discretion in admitting photographs. State v. Warnick (1983), 202 Mont. 120, 127, 656 P.2d 190, 194. Photographs are admissible for the purpose of explaining and applying the evidence and for assisting the court and the jury in understanding the case. State v. Johnson (1986), 221 Mont. 503, 515, 719 P.2d 1248, 1256. When considering whether photographs should be admitted as evidence at trial, the court must determine whether their probative value is substantially outweighed by the danger of unfair prejudice. State v. Gollehon (Mont. 1993), ___ P.2d ___, ___, 50 St. Rep. 1564, 1567.

In _Gollehon,_ the State introduced twenty autopsy photographs taken by the medical examiner. The defendant contended that the photographs had little probative value and should have been excluded. The photographs were only exhibited during the medical examiner's testimony, and the jury was not allowed to take the photographs into deliberations. We held that, although the photographs depicted the brutality and viciousness of the crimes committed, they were admissible. We stated that we did not believe the photographs would arouse the jurors' passions any more than other evidence of the defendant's conduct. "We will not demand that a trial be sanitized to the point that important and probative evidence must be excluded." _Gollehon,_ 50 St. Rep. at 1567.

As in _Gollehon,_ the autopsy slides here were only exhibited during Dr. Henneford's testimony for demonstrative purposes. The State did not introduce the slides into evidence; therefore, the

11

jury was not allowed to take the slides into deliberations. In addition, the District Court only allowed a few to be shown during Dr. Henneford's testimony. Dr. Henneford testified that the slides were helpful in describing the procedures he used, and referred to the slides to describe the nature and extent of Ashley's injuries and to show that her injuries could not have occurred through choking, gagging, or as the result of a fall or febrile seizure. We hold that the autopsy slides provided important and probative evidence in explaining to the jury how and why Ashley died, and thus were properly used for demonstrative purposes.

The State also introduced a photograph of Ashley when she was alive. Mergenthaler contends that this was prejudicial error. Again, after reviewing the transcript of trial proceedings, we find that the District Court carefully reviewed various in-life photographs in chambers and rejected a number of photographs, including one of Ashley sitting on Donna's lap. The District Court allowed one photograph of Ashley, wearing a snowsuit, sitting on the back of a pickup truck, taken a few weeks before her death, to be introduced to the jury to show who the victim was and what she looked like.

The child's size, age, condition, vulnerability, and health were central issues in this case. We have previously held that photographs are admissible if they are relevant to describe a person, place, or thing involved in the case. State v. Mayes (1992), 251 Mont. 358, 371, 825 P.2d 1196, 1205.

In this case, the State maintains that the photograph was

12

relevant to show the jury how Ashley looked and what her health was a few weeks prior to the homicide. The photograph shows a happy, healthy, thirteen-month old child, taken a few weeks prior to her death. There was nothing in particular about this photograph that would inflame the passions or emotions of the jury, and Mergenthaler cannot show any prejudice. See Mayes, 825 P.2d at 1205. We hold that the District Court did not abuse its discretion in allowing the State to introduce the photograph of Ashley.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

13

January 20, 1994

CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


WILLIAM F. HOOKS
Appellate Defender
P.O. Box 200145, Captitol Station
Helena, MT 59620-0145

HON. JOSEPH P. MAZUREK, ATTORNEY GENERAL
Elizabeth Griffmg, Assistant
215 N. Sanders, Justice Building
Helena, MT 59620

HON. JEFFREY M. SHERLOCK
District Judge
228 Broadway, Dept 3
Helena, MT 59623

MIKE MC GRATH, COUNTY ATTORNEY
228 Broadway
Helena, MT 59623

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
    Deputy