No. 04-410

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 177

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

JAMES ENGLISH,

        Defendant and Appellant.

APPEAL FROM:    The District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 02-0376,
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Nancy G. Schwartz, LaRance, Syth & Schwartz, Billings, Montana

        For Respondent:

            Honorable Mike McGrath, Attorney General; Mark Mattioli,
Assistant Attorney General, Helena, Montana

            Dennis Paxinos, County Attorney; David Carter, Deputy County
Attorney, Billings, Montana

                     Submitted on Briefs:  August 10, 2005

                                  Decided:  August 1, 2006

Filed:

                    _____
                              Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 James English (English) appeals from the judgment and sentence entered by the Thirteenth Judicial District Court, Yellowstone County, upon a jury verdict finding him guilty of negligent homicide. We affirm.

¶2 We consider the following issues on appeal:

¶3 Did the District Court abuse its discretion by denying the Defendant's motion for a directed verdict?

¶4 Did the District Court abuse its discretion by admitting the results of the Defendant's blood alcohol test?

¶5 Was the intoxication instruction given to the jury an incorrect statement of the law and reversible error?

¶6 Did the District Court abuse its discretion by admitting statements made by the victim?

¶7 Did the District Court abuse its discretion by admitting photographs of the victim?

¶8 Did the District Court penalize the Defendant for taking his case to trial, thereby violating his due process rights?

¶9 Did the District Court err in ruling that the homicide was a crime of violence and by failing to consider sentencing alternatives to prison?

¶10 Should this Court exercise plain error review to examine whether comments made at trial regarding the Defendant's silence violated his Fifth Amendment and state constitutional rights?

BACKGROUND

¶11     Strange things happen.  The following events took place on the evening of May 2, 2002, and the early morning of May 3, 2002.

¶12     Between 4:00 p.m. and 5:00 p.m., Benjamin Nielsen (Ben) dropped off his wife, Wilma Nielsen (Wilma), in downtown Billings so that she could go see some friends. Around 7:00 p.m. or 7:15 p.m., Ben received a call from someone named Karen at the Empire Lounge telling him that he needed to pick up Wilma because she was intoxicated. Ben waited about twenty minutes, and then drove his van downtown to find Wilma.

¶13     At the Empire Lounge, Ben collected a bag of clothing Wilma had left for him, but he did not see her there.  After twenty to thirty minutes of looking for her at several other bars, Ben returned at a little after 8:00 p.m. to the Empire Lounge and found Wilma standing outside with a man.  They were drinking whiskey straight from the bottle.  Ben, Wilma, and the other man went to the Rainbow Club, about a five minute walk from the Empire Lounge, and ordered more drinks.

¶14     After they finished their drinks, Ben was going to order another round when Wilma seemed to become upset about something and went to the bathroom.  She stayed in the bathroom weeping for about ten minutes, after which the three companions left the bar and started walking back toward the Empire Lounge.  They only went about thirty to forty feet before Wilma angrily told the other man to get away from her.  Ben and Wilma argued about taking her home, but she said she was going to go partying.  She stepped to the curb and stuck out her thumb.  A van pulled up.

3

¶15     Wilma opened the side door of the van and got in, telling the driver that she wanted to go to the airport or bus station. Ben got in the front passenger seat, and they all introduced themselves. Ben told the driver, who was the Defendant, James English, that he needed to get Wilma home. English and Ben got out of the van, briefly went into the Rainbow Club, then came out again and got back into the van. Ben and Wilma argued about whether she should go home, and English said, "I ain't got time for this . . . ." English asked Ben to step out of the van, saying "Go down and get your van and I'll help you get your wife home." Ben got out, leaving Wilma lying on a mattress in the back of the van. That was at about 8:45 p.m. The next time Ben would see his wife would be the following morning in the intensive care unit of the hospital.

¶16     After exiting English's vehicle, Ben ran to get into his van to follow English and Wilma because he suspected that they might be going off to have sex. He drove for about two hours, went home for about forty-five minutes, and then searched for another two hours, but he did not find them.

¶17     About an hour after Ben parted company with Wilma and English, Toby and Brenda Kline were driving by their business located near the Reporter Office Products parking lot in an industrial area of Billings. They noticed a van parked in the lot at a strange angle with its wheels turned sharply to the left. A man, later identified as English, was standing outside the van looking down at someone, later identified as Wilma, lying on the ground. The Klines drove around the block once or twice to get a look at the scene, then parked about 125-135 yards away and watched the two strangers

4

with binoculars. Wilma was lying on her back about ten to fourteen feet from the open side door of the van, not moving at all. Though English is a large man, he struggled to pull Wilma—who was quite large as well—toward the van, dragging her head on the ground and dropping her in the process. English ultimately succeeded in getting her to within two or three feet of the van.

¶18 As they observed this odd behavior, the Klines called 911; records indicate the time was 9:59 p.m. During and after the call to the police, the Klines saw English walk around and step over Wilma several times. He appeared to be talking to her. At one point, English walked to the driver side and got in the van, sat there for roughly twenty seconds, got back out, and resumed stepping over and walking around Wilma. Between four and six minutes after the Klines called 911, a police patrol car arrived at the scene, followed by other patrol cars and an ambulance.

¶19 Officers Steve Swanson and David Dierenfield were the first officers on the scene. After evaluating the situation, they directed English to sit on a parking block a short distance away from Wilma and the van. The officers repeatedly asked English what had happened to Wilma, but he refused to answer, saying that he knew what happened but was not involved. Officer Dierenfield then arrested English and put him in one of the patrol cars. When the police commander, Sergeant Thomas Vladic, arrived five to ten minutes later, he asked English what had happened to Wilma, but he said he would only talk if Sergeant Vladic would give him a cigarette, which the officer declined to do. At

5

3:52 a.m., almost six hours after English's arrest, the police conducted a blood alcohol test on him pursuant to a search warrant. His blood alcohol content at that time was .06.

¶20 Paramedic Eric Fisher performed the initial assessment of Wilma in the parking lot, noting that she had abrasions all over her body, had several broken ribs, and had a broken bone in her leg that was protruding through her skin. Wilma was taken to Deaconess Hospital, treated by a trauma team, and subsequently placed in the intensive care unit. She died nineteen days later of complications resulting from being run over by a motor vehicle. The autopsy revealed that Wilma had roughly twenty broken ribs, a fractured pelvis, and severe sepsis.

¶21 English was charged with negligent homicide, a felony. A jury convicted English of the charge, and he was sentenced to twenty years imprisonment with ten years suspended. English appeals.

## DISCUSSION

¶22 **Did the District Court abuse its discretion by denying the Defendant's motion for a directed verdict?**

¶23 In *State v. DeWitt*, 2004 MT 317, ¶ 34, 324 Mont. 39, ¶ 34, 101 P.3d 277, ¶ 34 (citation omitted), we recited the standard of review for a denial of a motion for directed verdict:

> We review a district court's denial of a motion for a directed verdict to determine whether the court abused its discretion. In doing so, we determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. Abuse of discretion occurs only when the district court acted arbitrarily without the employment of conscientious

6

judgment or exceeded the bounds of reason resulting in substantial injustice.

¶24 Section 45-5-104(1), MCA, defines negligent homicide: "A person commits the offense of negligent homicide if the person negligently causes the death of another human being."

¶25 Section 45-2-101(42), MCA (2001), defines the mental state "negligently" as follows:

> "Negligently"—a person acts negligently with respect to a result or to a circumstance described by a statute defining an offense when the person consciously disregards a risk that the result will occur or that the circumstance exists or when the person disregards a risk of which the person should be aware that the result will occur or that the circumstance exists. The risk must be of a nature and degree that to disregard it involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Gross deviation" means a deviation that is considerably greater than lack of ordinary care.

¶26 English argues that the State failed to produce sufficient evidence to permit a jury to convict him. He focuses on the fact that the amended information charged him with negligently causing Wilma's death by driving and contends that the State inappropriately expanded its theory at trial to allege he was negligent "'before, during and after' the incident where Wilma was struck by the van." According to English, the only possibly relevant negligence was in the actual driving of the van, so he directs our attention to the State's own accident reconstruction expert, Dr. John Jurist. English states that Dr. Jurist testified that English "most likely would not have perceived the collision until after the collision happened" and that "it was most likely the defendant could not see Wilma prior to hitting her with his van." English further asserts that the State established no causal

7

link between his alcohol consumption and the van's impact with Wilma because, according to Dr. Jurist's testimony, English could not see Wilma before the van hit her, making impaired reaction time or judgment irrelevant.

¶27 English misrepresents Dr. Jurist's testimony. Dr. Jurist explained that, *given certain assumptions*—i.e., that Wilma was within twenty-eight to thirty-three inches of the vehicle, that the driver was of a particular height, that Wilma was lying prone on the ground, and that Wilma's body reached sixteen to nineteen inches of height when in that position—the driver may not have been able to see Wilma before running over her. However, Dr. Jurist makes it clear in other parts of his testimony that it may have been possible for English to see Wilma before impact because it was not known how far away Wilma was from the van when it began moving toward her. Whether English did in fact see Wilma before driving over her was not part of Dr. Jurist's testimony. Rather, this was a question of fact left to the jury to determine.

¶28 In addition, the evidence showing that Wilma was last seen as a passenger in English's van, that she was intoxicated but uninjured at the time she was last seen, and that her injuries were caused by being run over by English's vehicle is sufficient to permit a rational jury to infer that English negligently caused Wilma's death.

¶29 Accordingly, English has failed to establish that no rational trier of fact could have found the elements of the offense beyond a reasonable doubt, nor has he demonstrated that the District Court acted arbitrarily or exceeded the bounds of reason. Therefore, we

8

conclude that the District Court did not abuse its discretion by denying English's motion for a directed verdict.

¶30 **Did the District Court abuse its discretion by admitting the results of the Defendant's blood alcohol test?**

¶31 In *State v. Larson*, 2004 MT 345, ¶ 29, 324 Mont. 310, ¶ 29, 103 P.3d 524, ¶ 29 (internal quotation marks and citations omitted), we recited the standard of review for evidentiary rulings:

> Issues concerning the admissibility of evidence are within the discretion of the district court. The trial court is vested with great latitude in ruling on the admissibility of expert testimony. A district court has broad discretion to determine whether evidence is relevant and admissible, and absent an abuse of discretion, this Court will not overturn that court's ruling. The test for abuse of discretion is whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice.

¶32 English submitted a motion *in limine* to exclude the admission of evidence regarding his blood alcohol test. The District Court denied the motion in part because the State assured the court that it would present evidence linking English's impaired state to his negligent conduct. At trial, the State presented evidence regarding the alcohol test, English's probable alcohol impairment at the time that he ran over Wilma, and the effect that impairment would have had on his driving.

¶33 English argues on appeal that admitting the blood alcohol evidence was an abuse of discretion because there was no causal connection between English's impaired state and his alleged negligence. Moreover, English contends that the admission of the evidence was highly prejudicial. In support of his argument, English cites *Havens v.*

9

*State* (1997), 285 Mont. 195, 945 P.2d 941, a civil case in which this Court held that, in the absence of evidence connecting the traffic accident at issue with the plaintiff's alcohol consumption, the trial court erred in failing to grant a motion for a new trial because evidence of the plaintiff's alcohol consumption was irrelevant, prejudicial, and likely to confuse the jury.

¶34     English's reliance on *Havens* is misplaced. In *Havens*, the State's own expert testified that the plaintiff was not negligent, and other evidence was presented that Havens could not have avoided the accident. *Havens*, 285 Mont. at 198, 945 P.2d at 942. Thus, the presence of alcohol in Havens' blood was irrelevant absent a causal connection to the accident. *Havens*, 285 Mont. at 200, 945 P.2d at 944.

¶35     The present case is distinguishable. Here, the State presented evidence from Dr. Jurist that English may have been able to see Wilma before running over her. Likewise, the State presented evidence that English's driving abilities were likely impaired by the alcohol content of his blood. Given the circumstances, the evidence of his impaired mental state was a relevant factor for the jury to consider in determining English's negligence.

¶36     We came to a similar conclusion in *State v. Davis*, 2000 MT 199, 300 Mont. 458, 5 P.3d 547. In *Davis*, there was evidence that the defendant, Davis, had consumed at least five brandies and four beers in few hours prior to getting in his Jeep to drive home. While driving home, Davis struck a woman with his car as she walked on the side of the

road, killing her. Though the police did not arrest the defendant until the next day—making blood alcohol tests useless—we concluded that the

> jury could reasonably have found from the evidence presented that Davis consciously disregarded the risk posed by his driving under the influence of alcohol, and that his conduct immediately before, during, and after the accident reveals a gross deviation from the standard of conduct that a reasonable person, not under the influence of alcohol, would have observed.

*Davis*, ¶ 33.

¶37 Therefore, we conclude that the District Court did not act arbitrarily or exceed the bounds of reason, and thus it did not abuse its discretion by admitting the blood alcohol evidence.

¶38 **Was the intoxication instruction given to the jury an incorrect statement of the law and reversible error?**

¶39 We stated the applicable standard of review for jury instructions in *State v. Pittman*, 2005 MT 70, ¶ 30, 326 Mont. 324, ¶ 30, 109 P.3d 237, ¶ 30:

> We review jury instructions to determine whether the instructions as a whole fully and fairly instruct the jury on the applicable law. A district court has broad discretion in formulating jury instructions, and our standard of review is whether the court abused that discretion.

¶40 Jury Instruction Number 7 reads as follows: "Intoxication is not an essential element of negligent homicide. Intoxication is merely one of the factors to be considered in determining whether the death of Wilma Nielsen was caused by the negligent actions of James English."

11

¶41 English argues that this instruction, particularly the last phrase "negligent actions of James English," directs the jury to assume he was negligent. As a result, English maintains that the instruction was an incorrect statement of the law and was "extremely prejudicial."

¶42 We disagree and conclude that the jury instruction was a correct statement of the law. Intoxication is not an element of negligent homicide under the applicable law. Sections 45-5-104(1), MCA, 45-2-101(42), MCA (2001); *see State v. Arrington* (1993), 260 Mont. 1, 11, 858 P.2d 343, 349; *but cf. Larson*, ¶ 46 ("criminal negligence can arise as a result of intoxication"). Moreover, in the context of the other instructions, Instruction Number 7 does not direct the jury to assume English was negligent. Indeed, Instruction Number 6 states quite clearly that one of the two elements the jury must find in order to convict is that "the Defendant acted negligently." Instruction Number 8 goes on to define the term "negligently" without reference to intoxication. Given Instructions 6 and 8, it appears that the proper—and natural—reading of Instruction Number 7 is that the conjunction "whether" introduces an indirect question asking the jury to determine that English either acted negligently or did not act negligently. The purpose of the preceding clause was to explain that intoxication alone is not determinative on this point.

¶43 Consequently, we hold that the District Court did not abuse its discretion in giving the jury the intoxication instruction and that the instruction was a correct statement of the law.

**¶44 Did the District Court abuse its discretion by admitting statements made by the victim?**

¶45 Once more, we review evidentiary rulings for abuse of discretion. *See* ¶ 31.

¶46 English contends that the District Court erred by admitting several statements that Wilma made to medical personnel. He argues that the District Court incorrectly admitted the statements pursuant to Rules 803(2) (excited utterance) and 803(4) (medical diagnosis), M.R.Evid.

¶47 However, the District Court admitted the statements on other grounds as well—namely, Rule 803(1) (present sense impression), Rule 803(3) (mental or physical condition), and Rule 804(b)(5) (circumstantial guarantees of trustworthiness), M.R.Evid. Because English offers no argument regarding the additional bases for the District Court's admission of these statements, we cannot conclude that the District Court acted arbitrarily or beyond the bounds of reason, and we need not decide whether the court erred by admitting the statements pursuant to Rules 803(2) and 803(4). Failure to challenge each of the alternative bases for a district court's ruling results in affirmance. *See Skinner v. Allstate Ins. Co.*, 2005 MT 323, ¶ 9, 329 Mont. 511, ¶ 9, 127 P.3d 359, ¶ 9 (failure to argue results in abandonment of issue); Rule 23(a)(4), M.R.App.P. (appellant must present arguments).

¶48 Thus, we hold that the District Court did not abuse its discretion in admitting Wilma's statements.

¶49 **Did the District Court abuse its discretion by admitting photographs of the victim?**

¶50 In *State v. Dunfee*, 2005 MT 147, ¶ 26, 327 Mont. 335, ¶ 26, 114 P.3d 217, ¶ 26 (citations omitted), we addressed the standard for reviewing the admission of photographs:

> A district court's decision regarding the admissibility of evidence should not be set aside unless there is an abuse of discretion. In considering whether photographs should be admitted, a district court must determine whether the probative value of the photos outweighs any prejudicial effect. This Court has consistently held that photographs possessing instructive value are relevant and admissible provided their probative value is not substantially outweighed by the danger of unfair prejudice.

"The test for abuse of discretion is whether the trial court acted arbitrarily or exceeded the bounds of reason resulting in substantial injustice." *State v. Kearney*, 2005 MT 171, ¶ 12, 327 Mont. 485, ¶ 12, 115 P.3d 214, ¶ 12.

¶51 English argues that certain photographs taken of Wilma in the emergency room were improperly admitted because they were inflammatory, irrelevant to the question of English's negligence, and far more prejudicial than probative. In support of his argument, English cites *State v. Bristow* (1994), 267 Mont. 170, 882 P.2d 1041, in which this Court held that, where bodily injury was not in dispute, four enlarged color photographs showing the victim's severe injuries were of little or no probative value in establishing accountability for an aggravated kidnapping. English contends that the instant case is analogous to the situation in *Bristow*, arguing that Wilma's death was not in dispute here.

14

¶52   We disagree and hold that the photographs were relevant to show the type of injury and to aid in understanding trial testimony.  Although Wilma's death was not in dispute, her particular injuries, as documented in the photographs at issue here, may have been useful to the jury in understanding the manner by which Wilma was injured, and when considered in light of the bizarre circumstances of the case—including English's odd behavior in the Reporter Office Products parking lot—they may have enabled the jury to make inferences about English's intent and state of mind when he drove the vehicle over Wilma.  Thus, the visual evidence of the injuries to Wilma was relevant because the type of injuries she sustained could have been a factor in determining English's negligence.  *See State v. Mergenthaler* (1994), 263 Mont. 198, 205, 868 P.2d 560, 564 ("Photographs are admissible for the purpose of explaining and applying the evidence and for assisting the court and the jury in understanding the case.").

¶53   Therefore, we conclude that the District Court's decision did not result in substantial injustice and, accordingly, that the District Court did not abuse its discretion by admitting the photographs.

¶54   **Did the District Court penalize the Defendant for taking his case to trial, thereby violating his due process rights?**

¶55   "This Court reviews a district court's sentence for legality only, confining its review to whether the sentence falls within the parameters set by statute."  *Dunfee*, ¶ 46. Section 45-5-104(3), MCA, sets the maximum penalty for negligent homicide at twenty years in prison and a $50,000 fine.

15

¶56    English, relying on *State v. Baldwin* (1981), 192 Mont. 521, 629 P.2d 222, and *State v. Tate* (1982), 196 Mont. 248, 639 P.2d 1149, contends that in sentencing him to twenty years imprisonment with ten years suspended the District Court imposed a "trial tax" on him for taking his case to trial instead of pleading guilty. English directs our attention to comments the trial judge made at the sentencing hearing, and he contends that the "district court's comments, especially in view of the disparity between sentences in the cases reviewed by the district court—cases the district court specifically noted the defendants had pled guilty or nolo contendere—establish a clear due process violation."

¶57    English's argument is unpersuasive. The District Court focused on the aggravating circumstances in English's case—i.e., the influence of alcohol on both English and Wilma, English's statements in the presentence investigation report, the violence involved, and English's failure to call for help—not on the sentences imposed in prior negligent homicide cases. The District Court's review of sentences in prior negligent homicide cases was at the prompting of the parties and in compliance with § 46-18-101(3)(b), MCA, requiring sentences to be commensurate with the punishment imposed on others committing the same crime. There is no indication from the record that the District Court imposed a "trial tax" on the defendant for proceeding to trial. To the contrary, the District Court merely acknowledged that there is a distinction between sentences imposed on those who plead guilty or *nolo contendere* and on those who plead not guilty but are convicted by a jury. Specifically, the District Court stated the following:

I have reviewed all of the Yellowstone County cases from—for negligent homicide from 1995, actually 1994 to the present.

. . . .

[T]he one constant that I have found in all of them is that every defendant pled guilty. One of them I believe entered a nolo contendere plea. The defense labels the State and the PSI [presentence investigation] author as imposing a trial tax. The sentence I impose is not imposed because Mr. English chose to exercise his right to go to trial, but there is a distinction with one pleading guilty before trial, admitting responsibility and someone after the fact expressing remorse and foxhole religion.

The District Court's assessment is correct. *See Baldwin*, 192 Mont. at 525, 629 P.2d at 225 ("A policy of leniency following a plea is proper . . . ."); *cf. State v. Allen* (1996), 278 Mont. 326, 335, 925 P.2d 470, 475 ("a mere disparity between the sentence offered during plea bargaining and that ultimately imposed is not, of itself, improper") (citing *Baldwin*, 629 P.2d at 225).

¶58    In *Baldwin*, the trial judge was involved in the plea bargaining process, offering a lenient sentence of forty-five days of jail time if the defendant pled guilty. However, the defendant chose to enter a plea of not guilty and to proceed to trial. He was convicted and subsequently sentenced to ten years in prison. We held in that case that "a sentencing court which becomes involved in the plea bargaining process, and which imposes a harsher sentence after trial than was offered in exchange for a guilty plea, must specifically point out the factors that justify the increased sentence." *Baldwin*, 192 Mont. at 527-28, 629 P.2d at 226. Because there was no indication in the record explaining the disparity, we vacated the sentence and remanded the cause for resentencing. Our decision in *Tate*—which involved similar circumstances—merely vacated the defendant's

17

sentence and remanded the cause for resentencing in conformity with *Baldwin*. *Tate*, 196 Mont. at 250-51, 639 P.2d at 1150.

¶59 As noted, at issue in *Baldwin* was the disparity between the sentence offered in the plea bargaining process and the final sentence imposed after trial and conviction. In the instant case, the District Court was not involved in any plea bargaining process at all, and English acknowledges as much. However, English cites *Baldwin* and its successor, *Tate*, as support for his argument that the disparity between *his* sentence and the sentence imposed on *others* who committed the same crime—but who pled guilty or *nolo contendere*—amounts to a due process violation. We discern no indispensable logical connection between the holding in *Baldwin* and the proposition that English sets forth here. In fact, *Baldwin* supports the contrary idea that there may be appropriate differences between sentences imposed upon defendants who have pled guilty and those that have proceeded to trial. *See* ¶ 57. Therefore, we conclude that the twenty-year sentence (ten suspended) imposed by the District Court was within the statutory parameters and did not violate English's due process rights.

¶60 **Did the District Court err in ruling that the homicide was a crime of violence and thereby failing to consider sentencing alternatives to prison?**

¶61 "The interpretation of a statute is a question of law that we review to determine whether the interpretation is correct." *State v. Allum*, 2005 MT 150, ¶ 14, 327 Mont. 363, ¶ 14, 114 P.3d 233, ¶ 14. Moreover,

> in construing statutes, the function of the court is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what

18

has been omitted or to omit what has been inserted. Where the plain language of the statute is clear and unambiguous, no further interpretation is required.

*State v. Kroll*, 2004 MT 203, ¶ 17, 322 Mont. 294, ¶ 17, 95 P.3d 717, ¶ 17 (citations omitted).

¶62 Section 46-18-104(2)(a)(ii), MCA, states that unless the context requires otherwise, "a crime in which the offender causes serious bodily injury or death to a person other than the offender" is a crime of violence. Section 46-18-101(f), MCA (2001), states, "Sentencing practices must provide alternatives to imprisonment for the punishment of those nonviolent felony offenders who do not have serious criminal records."

¶63 English argues that the homicide he committed was not a crime of violence, and, further, that to literally interpret § 46-18-104(2)(a)(ii), MCA, to include negligent homicide as a crime of violence leads to absurd results. Thus, he contends that, pursuant to § 46-18-101(f), MCA, he was entitled to have the District Court consider alternatives to imprisonment.

¶64 English's argument is unpersuasive. He caused Wilma Nielsen's death through his negligence. Section 46-18-104(2)(a)(ii), MCA, is clear, and the District Court correctly interpreted it. Additionally, we do not perceive that the literal application of the statute leads to any "absurd results" in the present circumstances. Therefore, we conclude the District Court did not err in ruling that the homicide was a crime of violence or by failing to consider sentencing alternatives to prison.

19

**¶65 Should this Court exercise plain error review to examine whether comments made at trial regarding the Defendant's silence violated his Fifth Amendment and state constitutional rights?**

¶66 We articulated the standards for applying plain error review in *State v. Finley* (1996), 276 Mont. 126, 137-38, 915 P.2d 208, 215, *overruled on other grounds by State v. Gallagher*, 2001 MT 39, 304 Mont. 215, 19 P.3d 817:

> [T]his Court may discretionarily review claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection is made . . . where failing to review the claimed error at issue may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. . . . [W]e will henceforth use our inherent power of common law plain error review sparingly, on a case-by-case basis . . . .

¶67 English contends that the District Court committed plain error by admitting the testimony of several officers and paramedic Fisher. The admission of this testimony, English argues, violated his right to remain silent guaranteed by the Fifth Amendment and Article II, Section 25 of the Montana Constitution.

¶68 At the outset, English concedes that his trial counsel failed to object to the testimony or to request a mistrial. In addition, though it is not entirely clear which specific portions of testimony English now finds objectionable, it appears that at least one of the claimed inappropriate references to English's silence was elicited by his own attorney on cross-examination. Nevertheless, he calls the admission of the testimony "egregious" and "plain error."

20

¶69    English does clearly direct our attention to two portions of testimony, which he labels as the "most offensive" to him. One occurred during Officer Swanson's testimony, the first police officer called as a witness in the trial:

> Q. [by the State] What did you ask the defendant about whether he wanted a lawyer?
>
> A. [by Officer Swanson] I never did ask the defendant if he wanted a lawyer. I really didn't question him that much at all.
>
> Q. What information did he provide you regarding whether he wanted a lawyer?
>
> A. I had never heard the defendant ask for a lawyer. First I had heard was Sergeant Vladic had told me that he had, what we say, lawyered up, he requested a lawyer.

The second "most offensive" piece of testimony came during redirect examination of the next witness, Officer Dierenfield:

> Q. [by the State] Now, you testified on cross-examination that it's very rare that someone doesn't tell you what happened if it was an accident.
>
> A. [by Officer Dierenfield] In my experience, the only time they don't want to tell me something is when they're hiding something. Accidents, they're drunk, they're DUI, they don't want to talk to me, they don't want me to smell their alcohol. Give a gazillion examples, but I would say very, very, very rare that they just say I'm not going to tell you what happened, very, very rare. They'll tell you something, whether or not it's the truth or if it's false, they'll tell you something usually. To just tell you absolutely nothing, extremely rare.

Officer Dierenfield went on to testify that he did not hear English request a lawyer.

¶70    After Officer Dierenfield completed his testimony, the parties had an in-chambers discussion with the judge. During that meeting, English's counsel, alluding to the witness' references to whether English had requested a lawyer, said the following:

21

> We are simply saying that we do believe it's impermissible comment, and we would ask that the prosecution refrain from illiciting [sic] any further testimony about whether he is hiding something, whether he has requested an attorney. Because at some point, I think that we will move for a mistrial if there's further comment on the exercise of his constitutional rights.

The District Court responded, "I'm not being asked to rule on any motions now." English's counsel said, "Absolutely not." No motion for mistrial was ever made.

¶71     What is clear from the above exchanges is that English's counsel consciously chose not to object to the "offensive" testimony or to move for a mistrial on the grounds that the defendant's right to remain silent was offended by the officers' testimony. Together with the principle that we invoke plain error doctrine sparingly, *Finley*, 276 Mont. at 138, 915 P.2d at 215, we have repeatedly emphasized the need for counsel to make contemporaneous objections at trial. *State v. Sullivan* (1996), 280 Mont. 25, 33, 927 P.2d 1033, 1038; *Finley*, 276 Mont. at 138, 915 P.2d at 215.  In addition, we have said that we will not overturn a district court for an error it did not have the opportunity to address:

> It has long been the rule of this Court that on appeal we will not put a District Court in error for a ruling or procedure in which the appellant acquiesced, participated, or to which appellant made no objection. Acquiescence in error takes away the right of objecting to it. This Court will not hold a district court in error when it has not been given an opportunity to correct itself.

*State v. Gardner*, 2003 MT 338, ¶ 44, 318 Mont. 436, ¶ 44, 80 P.3d 1262, ¶ 44 (internal citations and quotation marks omitted).

¶72     Without further elucidation from English about how the admission of the less offensive testimony was plainly erroneous, or even about which pieces of testimony

22

English places in this category, we cannot conclude that a manifest miscarriage of justice has occurred. As for the two "most offensive" pieces of testimony, it is not plain or obvious that they constitute an affront to English's constitutional rights, or if they do, that they produced a miscarriage of justice or left unsettled the fairness of the trial. Indeed, English discusses at great length the law regarding the right to remain silent, but he does not clarify how the testimony was instrumental to the State's case or how it sullied the entire trial. English's raw assertion on appeal that the offensive testimony "pervaded the entire trial" is left ultimately undeveloped, leaving us to wonder why, if the assertion is true, his trial counsel did not move for a mistrial or otherwise object to the testimony, especially when counsel had raised that very prospect to the trial judge. It is entirely possible that the absence of such action by his counsel was the result of purposeful trial strategy or tactic. Either way, the question betrays the assertion and suggests that if there was an error here, it was certainly not plain. *See State v. Godfrey,* 2004 MT 197, ¶ 38, 322 Mont. 254, ¶ 38, 95 P.3d 166, ¶ 38 ("A fundamental aspect of 'plain error,' is that the alleged error indeed must be 'plain.'"). Accordingly, we decline to invoke the plain error doctrine.

## CONCLUSION

¶73 For the foregoing reasons, the judgment and sentence of the District Court are affirmed.

/S/ JIM RICE

23

We concur:

/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

Justice James C. Nelson dissents.

¶74    I dissent from the Court's decision on Issue 3—the jury instruction issue—and would reverse and remand for a new trial.  Therefore, I do not reach the Court's analysis or resolution of any of the other issues in this case.

*Instruction Issue – Issue No. 3*

¶75    The instruction at issue, No. 7, states:

> Intoxication is not an essential element of negligent homicide. Intoxication is merely one of the factors to be considered in determining whether the death of Wilma Nielsen was caused by the negligent actions of James English.

This instruction, as noted by the Court at ¶ 42, was given in conjunction with Instructions 6 and 8.  Instruction 6 requires the jury to find that English "acted negligently" in causing the death of Wilma Nielsen if it is to find him guilty of negligent homicide.

¶76    Instruction 8 defines the term "negligently" as follows:

> A person acts negligently with respect to a result or to a circumstance described by a statute defining an offense when the person consciously disregards a risk that the result will occur or that the circumstance exists or when the person disregards a risk of which the person should be aware that the result will occur or that the circumstance exists.  The risk must be of a nature and degree that to disregard it involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.  "Gross deviation" means a deviation

24

that is considerably greater than lack of ordinary care. Relevant terms, such as "negligent" and "with negligence", have the same meaning.

¶77 The jury's charge in this case was to determine if English (a) caused Wilma Nielsen's death and, if yes, (b) whether he did so "negligently" and, if yes, (c) whether his conduct disregarded a risk in light of the circumstances and, if yes, (d) whether that risk constituted a "gross deviation" from the reasonable or ordinary standard of care. In other words, in order to convict English of negligent homicide under the law of this case, the jury had to make four independent, but coordinate, factual determinations: (a) and (b) (from Instruction 6) and (c) and (d) (from Instruction 8). If the jury reached a negative answer on any one of these four determinations, then it was obligated to find English not guilty (see Instruction 6).

¶78 However, here, the court took from the jury the necessity to make three out of four of those factual determinations. With Instruction 7, the court pre-determined for the jury that English's actions were negligent. Contrary to the Court's statement in ¶ 42, the use of "whether" in the context of the passive voice phrase, refers only to "whether" English caused Wilma Nielsen's death; having answered "yes" to that question, the next question is answered for the jury by the court—the cause was the "negligent actions" of English. The jury did not have to determine *whether* English's actions *were* negligent; the court told the jury they were—*"the negligent actions"* of English.

¶79 The court could have used the word "conduct" in place of "negligent actions," thereby leaving it to the fact-finder to determine whether such conduct was, as a matter of fact, "negligent" under the law. Rather, the court chose to characterize that conduct as

25

negligent in Instruction 7—i.e., it chose to use language in that instruction that told the jury what its decision was supposed to be on the very elemental fact that the jury, itself, was charged with deciding under Instructions 6 and 8. Thus, the court's faulty Instruction 7 obviated any need for the jury to make determinations on the material elements of the charge filed against English—i.e., (b), (c) and (d) referred to in ¶ 77 above.

¶80 As such, Instructions 6, 7, and 8 were hopelessly confusing and internally inconsistent. While instructions are to be read as a whole, it is also a well-established and long-standing rule of Montana law that giving conflicting instructions upon a material issue is reversible error. *Bohrer v. Clark* (1979), 180 Mont. 233, 246, 590 P.2d 117, 124 (citing *Skeleton v. Great Northern Ry. Co.* (1940), 110 Mont. 257, 100 P.2d 929).

¶81 English did not get a fair trial because of the trial court's internally inconsistent jury instructions on the material elements of the charge. The court abused its discretion by not fairly instructing the jury on the applicable law.

¶82 I would reverse and remand for a new trial. I dissent from our failure to do so.

/S/ JAMES C. NELSON

Chief Justice Karla M. Gray, dissenting.

¶83 I, too, respectfully dissent from the Court's determination on the jury instruction issue. Consequently, I would reverse and remand for a new trial and not reach the other issues raised in this appeal.

26

¶84 My rationale with regard to the instructional error is more direct than Justice Nelson's. Reading Instructions 6 through 8 together, I conclude that the error in Instruction 7 is the inclusion of the word "the" in front of the words "negligent actions." That one small word, in my view, constitutes sufficient prejudice to entitle English to a new trial.

¶85 As the Court discusses, Instruction 6 advises the jury that a necessary element of the offense is that the defendant acted negligently. Instruction 8 defines "negligently." Instruction 7 advises that intoxication is not a necessary element of the offense of negligent homicide, but can be considered by the jury. Had Instruction 7 said "[i]ntoxication is a factor to be considered in determining whether the death of Wilma Nielsen was caused by negligent actions of James English[,]" followed by Instruction 8, defining negligently, the instructions would not have been erroneous. While I agree with the Court that the instructions—taken as a whole—did not expressly direct the jury to assume English was negligent, it is my view that Instruction 6 at least likely caused substantial confusion to the jury.

¶86 I would reverse on the instruction issue and remand for a new trial on the negligent homicide offense. I dissent from the Court's failure to do so.

/S/ KARLA M. GRAY

27